**FLEMING, Adm'r of Wage and Hour Division of Department of Labor, v. SWIFT & CO.**

**Civil Action No. 1387.**

District Court, N. D. Illinois, E. D. Nov. 3, 1941.

827

Gerard D. Reilly, Sol., and Irving J. Levy, Asst. Sol., both of Washington, D. C., and Alex Elson, Regional Atty., and Robert J. Wieferich, Atty., both of Chicago, Ill. (Rufus G. Poole, Asst. Sol., and Milton C. Denbo, Atty., both of Washington, D. C., of counsel), for the administrator.

Mayer, Meyer, Austrian & Platt, Albert H. & Henry Veeder, and Edgar B. Kixmiller, all of Chicago, Ill. (Frederic Burnham, Edgar B. Kixmiller, Miles G. Seeley, and Arthur C. O'Meara, all of Chicago, Ill., of counsel), for defendant, Swift & Co.

Arthur J. Goldberg, of Chicago, Ill., for intervenor, Institute of American Meat Packers.

IGOE, District Judge.

Motions and suggestions having been made by the respective parties hereto for amendment of the order of this Court entered on September 19, 1941, and objections having been made by the defendant to the motions of the plaintiff and by the plaintiff to the motions of the defendant, and argument having been had thereon, it is hereby ordered that the order of September 19, 1941, be amended by striking out the findings of fact and conclusions of law which appear therein and by inserting in lieu thereof revised findings of fact and conclusions of law which read as follows:

Findings of Fact

The Court finds as a fact that:

1. The defendant is an Illinois corporation having a place of business, hereinafter referred to as the defendant's Chicago plant, located at Chicago, Illinois, within the jurisdiction of this Court, and having, directly and through subsidiaries, other places of business elsewhere throughout the United States, and in some foreign countries.

The defendant is engaged principally in acquiring and slaughtering livestock and in the processing, manufacturing, selling

and distributing of meat, meat products and by-products from livestock. It and its subsidiaries are also engaged in many other businesses and have numerous producing plants and distributing branches through the United States.

2. The violations in this case are concerned solely with the defendant's plant at Chicago, which consists of numerous buildings and located at the Union Stockyards. The plant occupies approximately one-half of the total area of the stockyards. Most of the activities listed are carried on by the defendant in its Chicago plant at the Union Stockyards. This plant is served by a number of railroads which run into the stockyards and by numerous switch tracks which run into many of the buildings which the defendant owns and controls. It is also serviced by a large number of motor trucks, many of which are owned or leased by the defendant.

3. The bulk of the sales made from the Chicago plant of the defendant were made to points outside the State of Illinois within the United States and to foreign countries and goods were sold by the defendant into interstate commerce during each week of the period in question in the case. The total purchases by the defendant at the Chicago plant from its branch plants and other units and from outside sources were likewise considerable, and almost all of these purchases were made from outside the State of Illinois.

4. The defendant did not compensate employees at its Chicago plant for work done in excess of forty-four (44) hours a week for the period from October 24, 1938, to October 24, 1939, and for work done in excess of forty-two (42) hours a week for the period from October 24, 1939, to the filing of this law suit on February 19, 1940, at the rate of one and one-half times the regular rate of pay for such overtime work; and did not compensate such employees for such overtime work because it claims that it was entitled to take an exemption as to these employees for such overtime work under sec. 7(c) of the Fair Labor Standards Act 1938, 29 U.S.C.A. § 207(c). The employees who did not so receive overtime compensation were working in all of the operating departments of the defendant at its Chicago plant. It is admitted by the defendant that these employees were engaged in interstate commerce, or the production of

goods for interstate commerce, during each week of the period in question, that is, from October 24, 1938, to February 19, 1940.

5. The terms "handling," "slaughtering," and "dressing" are words which are commonly used to describe certain operations in the meat packing industry and have a definite and well-accepted meaning in trade usage in the industry. The defendant, in its operations, uses the terms "handling," "slaughtering" and "dressing" in accordance with this trade usage.

6. The term "handling" as customarily used in the meat packing industry refers to those operations that start when the packing plant takes possession of livestock and includes all the operations down to the slaughtering of the livestock.

7. The term "slaughtering" as customarily used in the meat packing industry constitutes the whole killing operation and ends when animal life is extinct.

8. The term "dressing" as customarily used in the meat packing industry refers to the freeing of the carcass of hair, scurf, toenails, the evisceration of the carcass, the cleaning and separation of the warm fancy meats and the placing of these in the coolers. Likewise, all the operations performed upon the carcasses after slaughtering and until they go to the coolers, are included. The cleaning of casings is considered as "dressing", as is the grading of casings, if the grading takes place prior to salting. The removal of hides, pelts, bones, fats, blood and other materials from the dressing floor is also considered as "dressing" in the meat packing industry.

9. The following departments of the defendant at its Chicago plant are engaged in "handling," "slaughtering," and "dressing" as those terms are commonly used and accepted in the meat packing industry and by the defendant: Hog dressing, pork warm fancy meats, hog casing cleaning, fat hog casing, north beef dressing, north beef washing, north beef casing cleaning, north beef warm fancy meats, north sheep casing cleaning, east sheep casing cleaning, north sheep warm fancy meats, sheep casing cleaning, east sheep dressing, east sheep warm fancy meats, north sheep dressing and Saniseal. The remaining departments of the defendant are not engaged in "handling," "slaughtering," or "dressing" as those terms are so commonly used and accepted in the meat packing industry and by the defendant.

10. The receipts of each of the four species of livestock slaughtered at the defendant's Chicago plant fluctuate widely throughout the year at public and private markets. In the case of each such species of livestock there are usually one or two seasons during the year when the receipts are particularly heavy, that is, reach a peak. In addition there are short, sharp fluctuations in receipts within such broad seasonal swings in receipts. Seasonal fluctuations in the receipts of various species of livestock are caused by natural factors, such as the times when young animals are produced and the periods of time which are required to grow them to marketable size, the prices of feeds used in fattening animals for market, and the condition of grazing lands and pastures. Other fluctuations, and particularly the short, sharp fluctuations which occur throughout the year, are caused by a variety of factors which induce the livestock producers to send their livestock to market at particular times. Weather conditions and reports of market prices are among such factors. With the development of trucking facilities livestock producers within trucking distance of livestock markets may change their minds from day to day as to whether or not they will send their livestock to market.

The seasons during which the periods of seasonal peak receipts occur may be forecast, since they occur with a fair degree of regularity. It is not possible, however, to forecast the week, or in some years even the month when such peak receipts will occur. It is impossible to forecast with any useful degree of accuracy the amount of livestock that will be received at public or private markets day by day or week by week, at any time during the year.

The seasonal and other fluctuations in receipts of the different species of livestock do not coincide, and when the receipts of one type of livestock are heavy, or are increased suddenly, the receipts of one or more of the other types of livestock may be either light or heavy, increasing or decreasing.

11. Livestock is acquired by the defendant (1) at the Union Stockyards at Chicago where the defendant, along with other packers, examines the livestock and makes offers and purchases; (2) by direct shipment, e. g., livestock which is consigned specifically to defendant; (3) and through the Omaha Packing Company, a subsidiary of the defendant, which purchases livestock directly from the producers and tranships it to the defendant at the Union Stockyards. Defendant receives approximately 60 per cent of all of its sheep, 80 per cent of its calves, 10 per cent of its cattle and 60 per cent of its hogs from the Omaha Packing Company.

Both the Omaha Packing Company and the defendant have facilities for carrying over livestock from one day to another, penning, feeding and watering them. Sheep, particularly, are frequently fattened up for several weeks prior to slaughter.

12. The defendant does not purchase a fixed percentage of each week's receipts of any type of livestock available at the Union Stockyards, Chicago, or at the Omaha Packing Company, but rather its purchases vary considerably. The evidence shows that the variations in purchases are due to price of livestock and also prices for finished products; cost of processing, including labor, storage and overhead cost; inventory on hand of livestock, carcasses, and meat products; salability of finished product; and other considerations having no direct relation to the availability of livestock. In many weeks of the year the defendant increased its purchases of livestock, both relatively and in actual numbers, while the supply was dwindling, and conversely, the defendant frequently purchased less livestock during periods of heavy supply and thus avoided the impact of excess supplies. At still other times, and particularly in the case of hogs, the defendant increased its purchases of livestock by a greater proportion than receipts had increased.

13. Between 40 per cent to 50 per cent of the dressed hog carcasses cut at the Chicago plant come in from branch slaughtering plants of the defendant, principally those located at Marshalltown, Iowa, Watertown, North Dakota, and Winona, Minnesota.

14. Dressed hog carcasses of hogs killed at the Chicago plant are generally cut within a period of 24 to 48 hours. Dressed hog carcasses may remain in the cooler up to 96 hours, however, and in the case of dressed hog carcasses which are brought in from outside plants of the defendant, five days may elapse before cutting. Fancy meats remain in the cooler until sold or until it is decided to freeze them.

15. Curing operations on hogs take from 20 to 90 days depending on the type of cure. At least 40 per cent of the total cuts from dressed hogs go to cure. A large part of the meats, particularly hog meat, is placed in freezer storage for periods up to one year.

16. Dressed cattle carcasses remain in the cooler an average of three days, and substantial quantities are kept in the cooler for from seven to ten days.

17. Only a small part of good cattle and of lamb and veal is cut. Eighty per cent of the good cattle, 85 per cent of the lambs and 65 per cent of the veal are shipped out in carcass form.

18. In connection with some departments, such as Pard (dog) food, the ability of the company to carry on the manufacture of the product is dependent almost exclusively upon its ability to purchase the materials from outside. Eighty-eight per cent of the meat product, which constitutes only half of the ingredients of Pard (dog) food, is purchased by the defendant from its own branch plants or from competitors. The rest of the ingredients consisting of tomato puree, wheat and other commodities are also received from outside sources.

19. In practically every department producing a non-meat product, such as soap, glue, cheese industrial oils, the operations of the department are not dependent upon the operations on livestock at the Chicago plant of the defendant, but are dependent upon the receipt from outside sources of large quantities of the materials which go to make up the finished product.

20. With respect to products as to which there was testimony concerning deterioration, such as frozen meat, oils, lard, etc., the defendant's own inventories at its Chicago plant show very large amounts running into millions of pounds kept on hand at all times, which represent substantial percentages of the products produced by defendant at its Chicago plant.

21. Deterioration is controlled by the defendant through its immense storage facilities. The total amount of refrigerated space of all kinds is approximately 16,000,-000 cubic feet, 3,000,000 cubic feet being equipped for coolers for carcasses, and a large amount being equipped for freezers of 29 degrees Fahrenheit or below.

22. The storage space available to the defendant enables the defendant to hold in storage vast quantities of meat and non-meat products received when the supply is great and to process them at other seasons, when the supply is small, but when demand for the finished products may be large.

23. The departments of the defendant at its Chicago plant, wherein employees were more generally working overtime throughout the year, were not departments engaged in the handling, slaughtering or dressing of livestock, but were departments engaged in the manufacture of various products and by-products, such as glue, sausage, cooked hams, or other departments.

24. There is no direct relationship between hours of work and seasonal influxes of livestock in the departments of the defendant at its Chicago plant performing operations on livestock after the dressed carcasses are placed in the cooler.

25. The defendant applied the exemption, which it claimed under sec. 7(c), to its employees in the Chicago plant on an individual basis, claiming the right to work each of such employees 14 workweeks during the year without payment of overtime compensation required under sec. 7.

26. The defendant did not compensate certain of its employees for work done in excess of 44 hours a week for the period from October 24, 1938, to October 24, 1939, and for work done in excess of 42 hours a week for the period from October 24, 1939, to the filing of this law suit on February 19, 1940, at the rate of one and one-half times the regular rate of pay for such overtime work, on the ground that such employees were not engaged in interstate commerce or in the production of goods for interstate commerce during the period in question; or, if engaged in commerce, it is urged such employees came within the provisions of sec. 7(c) of the Act. However, at its place of business and during the periods mentioned in this paragraph, the defendant was engaged in interstate commerce and in the production of goods for interstate commerce, and the employees who did not so receive overtime compensation were engaged as clerks, standards checkers, timekeepers, watchmen, police, firemen, laborers, comptometer operators and in similar and related capacities, all of which services on the part of such employees were rendered in the course of, in connection with and necessarily incidental to the successful conduct of the defendant's business. Such employees were engaged in interstate commerce or the production of goods for interstate commerce within the meaning of the Act. As to

831

whether such employees were engaged in the handling, slaughtering or dressing of livestock, within the meaning of the Act, will require an individual finding as to each of such employees.

27. The defendant concedes that the employees for whom it claims a fourteen (14) workweek exemption from the overtime provisions of the Act under sec. 7(c) includes all of the employees involved in this lawsuit except those mentioned in the preceding paragraph.

28. The defendant at its Chicago plant did, during each week of the period in question in this case, transport, deliver, ship or sell into interstate commerce goods in the production of which its employees were employed in violation of sec. 7(a) (1) and 7(a) (2) of the Act, 29 U.S.C.A. § 207(a) (1, 2), and did thereby violate sec. 15(a) (1) of the Act, 29 U.S.C.A. § 215(a) (1). The defendant, at its Chicago plant, during each week of the period in question in this case, did employ employees engaged in interstate commerce or in the production of goods for interstate commerce in violation of sec. 7(a) (1) and 7(a) (2) of the Act, and did thereby violate sec. 15(a) (2) of the Act.

Conclusions of Law

The Court concludes as a matter of law that:

1. It has jurisdiction of the parties and of the subject matter of this cause.

2. The plaintiff is authorized to bring this action under sec. 11(a) of the Fair Labor Standards Act, 29 U.S.C.A. Best hereinafter referred to as the "Act."

3. The Court has jurisdiction to restrain violations of sec. 15 of the Act by virtue of the provisions of sec. 17 of the Act, 29 U.S.C.A. § 217.

4. The words "handling," "slaughtering," or "dressing," as used in sec. 7(c), are a functional limitation on the classes of employees for whom an exemption from the overtime provisions may be claimed by an employer.

5. In construing the words "handling, slaughtering and dressing," effect will be given to their trade usage and the exemption in sec. 7(c) of the Act will be restricted to the activities embraced by this trade usage.

6. The employees for whom an exemption from the overtime provisions of the Act can properly be claimed by an employer are those employees engaged in "handling," "slaughtering," and "dressing" livestock, and this would include only those employees of the defendant working in the following departments: Hog dressing, pork warm fancy meats, hog casing cleaning, fat hog casing, north beef dressing, north beef washing, north beef casing cleaning, north beef warm fancy meats, north sheep casing cleaning, east sheep casing cleaning, north sheep warm fancy meats, sheep casing cleaning, east sheep dressing, east sheep warm fancy meats, north sheep dressing, and Saniseal.

7. Sec. 7(c) of the Act does not exempt industries from the overtime provisions of the Act, but only the specific processes therein mentioned.

8. The term "place of employment" as used in sec. 7(c) of the Fair Labor Standards Act means those portions of the plant devoted by the employer to the handling, slaughtering, or dressing of livestock as those terms are construed herein. In addition to the employees specified in conclusion of law No. 6, any employee whose employment during any workweek is wholly within the place of employment, as herein defined, and who during that workweek is working exclusively in an occupation which is a necessary part of the handling, slaughtering or dressing of livestock, also comes within the exemption of sec. 7(c) of the Act.

9. Under sec. 7(c) of the Act the employer may elect to take the benefit of the exemption during any workweeks whether or not consecutive, in the calendar year not exceeding fourteen (14) workweeks in the aggregate for employees in the "place of employment" where the employer is engaged in "handling, slaughtering, or dressing" livestock.

10. The Court holds as a matter of law that the exemption extended by sec. 7(c) of the Fair Labor Standards Act of 1938 from the provisions of sec. 7(a) thereof, during a period or periods of not more than fourteen (14) workweeks in the aggregate in any calendar year, to employers engaged in handling, slaughtering, or dressing livestock, may be claimed by such an employer at different times as to each of his employees at a place of employment where he is so engaged, provided only that the exemption is not claimed as to any such employee for more than fourteen (14)

workweeks in the aggregate in any calendar year.

■ 11. An employer may not claim an exemption for any employee under sec. 7(c) if the employee during any part of the workweek for which the exemption is claimed does any work which does not fall within the scope of the exemption.

■ 12. At its place of business and during the period from October 24, 1938, to the filing of this lawsuit on February 19, 1940, defendant was engaged in interstate commerce and in the production of goods for interstate commerce, and employed as employees clerks, standards checkers, timekeepers, watchmen, police, firemen, laborers, comptometer operators, and others in similar related capacities, all of which services on the part of such employees were rendered in the course of and in connection with and necessary and incidental to the successful conduct of the defendant's business. Such employees were engaged in interstate commerce or in the production of goods for interstate commerce within the meaning of the Act.

The following described documents heretofore lodged with the Court are hereby ordered to be filed by the Clerk and become a part of the record in this cause:

Findings of Fact and Conclusions of Law submitted by the plaintiff;

Amendments to Findings of Fact and Conclusions of Law submitted by the plaintiff;

Proposed Findings of Fact and Conclusions of Law submitted by the defendant, Swift and Company;

Amended Proposed Findings of Fact and Additional Proposed Conclusion of Law submitted by the defendant;

Objections of the defendant, Swift and Company, to the Proposed Findings of Fact and Conclusions of Law submitted by the plaintiff;

Objections of plaintiff to the Proposed Findings of Fact and Conclusions of Law submitted by the defendant, Swift and Company;

Objections of plaintiff to the Amended Proposed Findings of Fact and Additional Proposed Conclusion of Law submitted by the defendant.

Except as substantially embodied in the Court's Findings of Fact and Conclusions of Law hereinabove in this order set forth, which are hereby respectively held and found by the Court, the Court hereby refuses all and each of the Findings of Fact and Conclusions of Law proposed by the respective parties and hereby ordered filed and made a part of the record as aforesaid.

So far as they are applicable, the said objections of the respective parties, hereby ordered filed and made a part of the record as aforesaid, stand as objections of said parties respectively to the Court's Findings of Fact and Conclusions of Law hereinabove in this order set forth, and all and each of said objections, to the extent that the same are so applicable, are hereby overruled.

Counsel will prepare and submit appropriate decree.