**UNITED STATES of America**

**v.**

**Simon HEILIG, trading as Pocomoke Provision Company**

**Cr. 23148.**

United States District Court
D. Maryland.
Jan. 30, 1956.

ber 8, 1952 and August 28, 1954, of seven employees in the production of goods for interstate commerce for workweeks longer than forty hours without paying them for hours in excess of forty at a rate not less than one and a half times their regular rate, in violation of U.S.C.A. Title 29, §§ 207 and 215(a) (2). Count 2 charged that between March 3, 1954 and August 28, 1954, the defendant falsely kept records required by Title 29, § 211 (c) and CFR Title 29, Chapter V, Part 516, of the hours per week worked by employees, knowing such records to be materially false in that they set forth a lesser number of hours than those actually worked, contrary to U.S.C.A. Title 29, § 215(a) (5). Count 3 charged the wilful and unlawful failure, from November 8, 1952 to August 28, 1954, to make, keep and preserve a record showing the hours worked by employees each workday and workweek, required by U.S. C.A. Title 29, § 211(c) and CFR Title 29, Chapter V, Part 516, contrary to Title 29, § 215(a) (5). The charge in the fourth count was for the unlawful and wilful transportation, shipment, delivery and sale in interstate commerce, between November 8, 1952 and August 28, 1954, contrary to the provisions of U.S. C.A. Title 29, § 215(a) (1), of meat products and by-products, including hides, skins and wool, in the production of which defendant's employees were employed in violation of U.S.C.A. Title 29, § 207.

George Cochran Doub, U. S. Atty., and William F. Mosner, Asst. U. S. Atty., Baltimore, Md., for the United States.

Bernard J. Flynn, Baltimore, Md., for defendant.

R. DORSEY WATKINS, District Judge.

The defendant was charged in a four count information with violations of the Fair Labor Standards Act of 1938 as amended. The first count charged employment by defendant between November-

The case was tried before the court without a jury. The testimony established that the defendant has operated in Pocomoke City, Maryland, a country slaughtering business for the past 29 years,[1] as a sole proprietorship. A maximum of nine employees have worked for him at any one time. The business consists of buying cattle from public yards and at sales, both in Maryland and in other States; their slaughtering and processing, including dressing, cooling, refrigerating, and cutting into wholesale and retail cuts; the sale at retail in

1. Except for the years 1945-1947.

Pocomoke City; and the sale and delivery at wholesale both in Maryland and in other States.

The evidence sufficiently established the interstate nature of the business, and this was freely conceded by defendant's counsel.

One of defendant's employees worked exclusively as a truck driver. Some of the others engaged in all phases of the business transactions. The activities of others were more restricted, but there was none whose work stopped with "dressing" the livestock. Under the facts in this case, the fourteen weeks' exemption of Title 29, § 207(c) would not be applicable. Walling v. Swift & Co., 7 Cir., 1942, 131 F.2d 249, affirming Fleming v. Swift & Co., D.C.Ill.1941, 41 F. Supp. 825; see also, Shain v. Armour & Co., D.C.Ky.1943, 50 F.Supp. 907; Selan v. Becker, D.C.Wis.1947, 71 F.Supp. 689.

From some time prior to 1952 until after the filing of the information, payroll records were kept, and the payroll prepared, by an accountant who worked for defendant, primarily on Saturdays, as a parttime bookkeeper.

In November 1952, as the result of an investigation by representatives of the Department of Labor, it was determined that defendant's payroll records were inadequate and that employees had worked in excess of forty hours per week, but had been paid the same weekly salaries regardless of the number of hours worked. This was called to defendant's attention, and was corrected by the payment of approximately $2,100 to employees by way of overtime compensation.

For about three months thereafter, records were kept showing hours worked, rate of pay, and total weekly salaries. These records showed some instances of a work week in excess of forty hours, in which case payment was made for the excess at time-and-one-half rates. Apparently these figures were obtained from notes kept by Rantz, the foreman, which were turned over weekly to the bookkeeper. According to Rantz, after about three months, or about March 1953, the bookkeeper told Rantz to turn in these memoranda, as the defendant was no longer going to pay overtime, but a weekly wage regardless of the hours worked. This is corroborated by another employee, who testified that the bookkeeper told him the law had been changed to eliminate overtime in their employment, and offered to bet $100 to that effect.

Thereafter, during the weeks covered by the information, defendant's records, except in two instances, showed exactly eight hours worked by each employee on each of the first five weekdays on which he worked, and exactly four hours for each Saturday on which he worked.

Rantz continued to keep private records of his own work time, and that of several other employees. These showed numerous variations in the hours worked per day, and many weeks in which the total exceeded forty-four hours. These notations in some instances are subject to question, particularly as to time shown to have been worked on holidays and Sundays; but the general tenor of these entries is supported by the testimony of the employees involved.

In August 1954, an investigator of the Department of Labor made a spot check of defendant's books to see if the records were in conformity with the law and applicable regulations. On their face, the records appeared to be in compliance. However, the investigator interviewed some of the employees at night, and learned the facts above outlined as to the practices since the 1952 investigation. He then talked with the defendant and the bookkeeper, and while not disclosing the nature of his investigation, or the existence of the Rantz notebook, told them that his investigation showed that more hours had been worked than were shown on defendant's books, and that the actual work week did not have the uniformity defendant's records showed. The de-

fendant insisted his books were correct.[2]

The defendant testified that his records were kept by his bookkeeper, who during a period not identified worked full time, then a day and one-half a week, then one day a week. Both before and after the 1952 investigation, the books were kept in the same manner, except that for a short time after the 1952 investigation, the books showed fluctuating hours worked and corresponding wage payments, and then a return was made to a straight weekly salary. Defendant purported not to know why this was done, but admitted that the bookkeeper had no authority to change wage rates; and would have to check with defendant before changing any wage rates.

Defendant testified that he understood he had to keep records, claimed he had never examined the books; but admitted that he knew that for a full week, payment was made for forty-four hours, regardless of the hours actually worked. He claimed that there were instances where employees did not work but were paid, and that if they worked overtime, they were given time off. He further admitted that he had seen employees report for work, and leave work, at other than the scheduled starting and stopping times.

His explanation for the uniform work week recorded was that he employed his men on a flat salary per week, regardless of the amount of time worked; that he thought this "averaged up"; and that it was not important to keep accurate records, since the employees were paid the same amount anyway.

Defendant's son, who had actively assisted the defendant in the business for more than a year, testified that in order to prove that the employees were not working as much as forty-four hours a week, and regularly quit work before 4 p. m., he had insisted upon the installation of a time clock in November, 1954. The time clock records showed an average work week of 45–46½ hours, except in Summer, when the working force was reduced to four men, and the average week was 48–50 hours. Since the clock was installed, employees have been paid at base rate for forty hours, and at time and one-half for all hours in excess of forty.[3]

This witness also testified that before installation of the time clock, the bookkeeper on Saturdays would ask him or the defendant what employees had worked on what days, and would credit them with four hours for Saturdays and eight hours for other days. No record of work over 44 hours was kept, and no compensation was paid for time in excess of 44 hours. The witness questioned the accuracy of Rantz's figures, but frankly admitted that the records of his father's business, before November, 1954, were not accurate.

The accountant's services were terminated in March 1955. He was not a witness, and was not within the District of Maryland at the time of the trial.

 From the foregoing statement of facts it is clear, and I find

1. Defendant employed persons in the production of goods for interstate commerce for workweeks longer than forty

---

2. Defendant and his counsel were critical of the failure of the investigator to return and discuss with defendant the information obtained from Rantz and other employees. On the stand, the investigator testified that he would have been willing to do so, but needed the consent of his superior, which was not forthcoming. This circumstance of course had no bearing upon whether or not the defendant had violated the law. The filing of criminal proceedings, without intermediate discussions, but after having told defendant that an investiga-

tion had been made which indicated violations, and after a previous admitted violation, is understandable and not justly subject to criticism.

3. This witness claimed that the employees used about five and one-half hours per week of the recorded time for changing their clothes, for which no deduction was made.

It was conceded that the volume of business was substantially the same before and after the installation of the time clock.

hours without paying them compensation for the hours in excess of forty at not less than one and one-half times the regular rate (Count One of the Information; U.S.C.A. Title 29, secs. 207 and 215(a) (2).

■ 2. Defendant made and caused to be made false records showing the hours purported to have been worked by various employees, employed in the production of goods for interstate commerce, which records were required by law and regulations to be kept, knowing such records to be false in a material respect (Count Two; U.S.C.A. Title 29, §§ 206, 207, 211(c) and 215(a) (5) and CFR Title 29, Chapter V, Part 516).

3. Defendant failed to make, keep and preserve a record showing the hours worked each workday and each workweek by employees engaged in the production of goods for interstate commerce, which record was required by law and regulations (Count Three; U.S.C.A. Title 29, §§ 206, 207, 211(c) and 215(a) (5) and CFR Title 29, Chapter V, Part 516).

■ 4. Defendant transported, shipped, delivered and sold, and caused to be transported, shipped, delivered and sold in interstate commerce, contrary to the provisions of U.S.C.A. Title 29, § 215(a) (1), goods in the production of which employees were employed in violation of U.S.C.A. Title 29, § 207, in that they were employed in the production of goods in interstate commerce for more than 40 hours per workweek without receiving compensation for hours in excess thereof at not less than one and one-half times their regular rates (Count Four; see also citations under Count One).

■ Counsel for defendant argues that even if the above-found violations exist, defendant is not liable because his acts or omissions were not "willful", in that his conduct was not intentionally, knowingly and purposely wrongful. In view of defendant's previous violation of the Fair Labor Standards Act, his con-

tinuation with the same bookkeeper, and the same records and method of payment except for about a three-month period, his conduct might well be classed as willful even under his counsel's definition. But it has been held that with respect to offenses of this character, and specifically as to violation of the Fair Labor Standards Act, an evil purpose or criminal intent is not necessary.

In Nabob Oil Co. v. United States, 10 Cir., 1951, 190 F.2d 478 at page 480, certiorari denied 342 U.S. 876, 72 S.Ct. 167, 96 L.Ed. 658, dealing with a violation of the Fair Labor Standards Act, the court said:

"In some penal statutes the word willful means that the offense must be committed malevolently, with a bad purpose or an evil mind. These offenses ordinarily involve moral turpitude but in those statutes denouncing acts not in themselves wrong, such an evil purpose or criminal intent need not exist. It is sufficient if the act was deliberate, voluntary and intentional as distinguished from one committed through inadvertence, accidentally or by ordinary negligence."

To the same effect as to crimes *mala prohibita* are Armour Packing Co. v. United States, 1908, 209 U.S. 56, 85–86, 28 S.Ct. 428, 52 L.Ed. 681; Shevlin-Carpenter Co. v. State of Minnesota, 1910, 218 U.S. 57, 68–69, 30 S.Ct. 663, 54 L.Ed. 930; Horning v. District of Columbia, 1920, 254 U.S. 135, 136–137, 41 S.Ct. 53, 65 L.Ed. 185; United States v. Illinois Cent. R. Co., 1938, 303 U.S. 239, 242–243, 58 S.Ct. 533, 82 L.Ed. 773; Landen v. United States, 6 Cir., 1924, 299 F. 75, 78–79; United States v. Perplies, 7 Cir., 1948, 165 F.2d 874, 876.

I find that defendant's conduct was willful within the meaning of U.S.C.A. Title 29, § 216, and find the defendant guilty on all four counts of the information.