330 F.2d 19
 W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellant,
v.
WESTERN COMPRESS COMPANY, a corporation, Appellee.
W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellant,
v.
FEDERAL COMPRESS AND WAREHOUSE COMPANY, a corporation, Appellee.
 No. 18718.
 No. 18719.
 United States Court of Appeals Ninth Circuit.
 April 2, 1964.
 
 Charles Donahue, Solicitor of Labor, Bessie Margolin, Associate Solicitor, Robert E. Nagle, Isabelle R. Cappello, and Altero D'Agostini, Department of Labor, Washington, D. C., for appellant.
 Snell & Wilmer, and Frederick K. Steiner, Jr., Phoenix, Ariz., and Nicholson & Moore, Memphis, Tenn., for appellees.
 Before KOELSCH, Circuit Judge, MADDEN, Judge of the Court of Claims, and DUNIWAY, Circuit Judge.
 MADDEN, Judge.
 
 
 1
 These two actions were brought in the District Court by the Secretary of Labor under Section 17 of the Fair Labor Standards Act[1] to enjoin further alleged violations of the overtime provisions of Section 7 of the Act. The two actions were consolidated for hearing and were submitted to the District Court on cross motions for summary judgment, based on a record consisting of stipulations and a deposition. The court granted the defendants' motions and entered judgments accordingly. The Secretary brought these appeals to this court, and the cases have been consolidated for purposes of appeal. No question is raised concerning the jurisdiction of the District Court or this court.
 
 
 2
 The defendants operate plants in which they engage in compressing cotton, and in handling the bales of cotton to and from the compresses. They also store the cotton which they compress, before and after the compressing is done. The defendants say that this storage is merely incidental to their principal activity of compressing. The Secretary attaches much more importance to the storage, as will appear later herein.
 
 
 3
 The generally applicable requirement of the Fair Labor Standards Act, with regard to the payment of overtime, is that overtime at the rate of time and one half must be paid for all work in excess of 40 hours in a week. The Act, however, makes exceptions to its generally applicable overtime requirement. The one of those exceptions which, the defendants urge, is applicable in the instant case is in Section 7(c) of the Act. That section provides, inter alia, that "[i]n the case of an employer engaged * * * in the ginning and compressing of cotton" the overtime requirements of the Act "shall not apply to his employees in any place of employment where he is so engaged." We print the full text of Section 7(c) in a footnote.[2]
 
 
 4
 The defendants compress but do not gin cotton. That fact, of itself, does not disqualify them for exemption. Peacock v. Lubback Compress Company, CA 5, 252 F.2d 892, cert. denied 356 U.S. 973, 78 S.Ct. 1136, 2 L.Ed.2d 1147.
 
 
 5
 This litigation concerns three separate plants of the defendant Federal Compress and Warehouse Company, and one plant of the defendant Western Compress Company. The Western Company plant is sufficiently typical for our purposes. It consists of one office building and a large warehouse building which is divided into twelve compartments. Only one of those twelve compartments contains compressing machinery. The other eleven compartments are storage compartments. The entire plant is within a fenced-in area.
 
 
 6
 Our question is whether those employees of the defendants who do not work at the compressing machines, nor at work rather immediately related to the compressing machines, such as, for example, hand trucking bales of cotton from their places of storage in the defendants' premises to the compressing machines, must be paid overtime. Employees, for example, who unload incoming cotton from trucks or railroad box-cars and place it in the defendants' warehouse space on the premises are claimed by the Secretary to be subject to, not exempt from, the overtime requirements of the Act.
 
 
 7
 One of the defendants' arguments for their exemption is that Section 7(c) creates an employer exemption. It says, "In the case of an employer engaged" etc., the overtime requirement shall not apply "to his employees in any place of employment where he is so engaged" (italics added). The defendants say that they are engaged in compressing cotton in this building complex and that the plain words of the statute remove all of their employees at this place of employment from the overtime requirements of the Act.
 
 
 8
 The argument that the § 7(c) exemption is an employer exemption, applicable to all employees of such an employer no matter what the particular employees work at or whether their work has any relation to the kind of activity which caused Congress to create the exemption, can be stretched beyond the breaking point. For example if, in the instant case, Western Compress had caused shoe manufacturing machines to be set up and operated in seasonally unused portions of its building, the fact that the shoemakers were employees of a cotton compressing employer would not put them under their employer's § 7(c) exemption from overtime pay, even though they worked at the place of employment where the employer is so (i. e., in the compressing business) engaged.
 
 
 9
 This court, in the case of Pan American World Airways, Inc. v. United Brotherhood etc., 9 Cir., 324 F.2d 217, did not feel obliged to give a completely literal interpretation to the statute there involved, the Railway Labor Act, where such an interpretation would have placed within the scope of that Act employees of a railroad company (actually an air transportation company) whose duties had no relation to railroading or air transportation. In our Pan American case we followed a similar holding in Jackson v. Northwest Airlines, D.C., D. Minn., 70 F.Supp. 501, reversed on another ground, Northwest Airlines v. Jackson, 8 Cir., 185 F.2d 74, but with the Court of Appeals expressing agreement with the District Court on the point here under discussion.
 
 
 10
 We are not willing to hold that Section 7(c) of the Fair Labor Standards Act creates an employer exemption which covers all of the employer's employees, whatever their actual work may be.
 
 
 11
 The defendants' second argument is that the word "compressing" as used in Section 7(c) encompasses all the work that the defendants' employees do at the plants. If that is true, the work falls within the exemption and that's the end of it. We consider, then, in greater detail what work is done at the defendants' plants. Cotton is brought or sent by its owners, via freight car or truck, to the defendants' plants. The cotton has already been ginned and baled by others. But the original baling does not reduce the volume of the cotton sufficiently to make it economical to ship it long distances by ships or railroads. The compressing machines, such as those operated by the defendants, reduce the volume of the cotton to "standard density" or to "high density," whichever degree of density the owner has ordered.
 
 
 12
 Returning to the place where the low density bales from the gin have been unloaded at the defendants' plants, the defendants' employees take samples from the bales, and tag and weigh the bales. The necessary paper work is done on the floor and in the office so that each bale can be identified as being the property of a specific owner, and as weighing a recorded amount, and as containing cotton corresponding to an identified sample and as being stored at a stated location in the plant. In the course of time, a very short time in the case of C.I.T. or "in transit" cotton, the bales of a particular owner, pursuant to an order which may have accompanied the bales themselves when they were brought to the defendants' plant, are removed from their place in storage and carried to the compressing room just as soon as their turn for compressing has come. And as soon as C.I.T. cotton is compressed, it is carried to the loading docks of the defendants and shipped out, by railroad or truck, as soon as such facilities are available. C.I.T. cotton is in and about the defendants' plants for periods of one to five days. Fifteen per cent of the cotton which the defendant Western compresses and 50% of that which the defendant Federal compresses is C.I.T. cotton. The Secretary concedes that all that is done in the defendants' plants in regard to the C.I.T. cotton is work exempt from the requirement that overtime be paid. This concession must be based on the fact that, in the Secretary's opinion, not only is operating the compressing machine "compressing" within the meaning of Section 7(c), but loading, unloading, weighing, sampling, tagging, recording and all the paper work related to the C.I.T. cotton is "compressing."
 
 
 13
 We consider now the cotton which comes to the defendants' plants without orders for immediate compressing and shipment out. It, like the C.I.T. cotton, has been ginned and baled by others. Much of it is already pledged, when it is delivered to the defendants' plants, to the Commodity Credit Corporation of the United States Government to secure loans made by the Government on the cotton. Unless the price of the cotton goes above the amount of the loan, the farmer will not repay the loan, and the Government will become the owner of the cotton. The owner, whoever he is, whether the Government or an individual, will ultimately order that his cotton be compressed and shipped out. During a one year agreed upon test period, more than one third of the cotton handled by the defendants, other than C.I.T. cotton, had been in the defendants' plants for more than four months. All the rest of it had been there for shorter periods.
 
 
 14
 The Secretary's suits were brought on the asserted ground that work done on the non-C.I.T. cotton was not exempt from overtime pay. That, of course, is because, so the Secretary asserts, no work on the non-C.I.T. cotton except the actual application of the compress to it is "compressing" cotton, within the meaning of Section 7(c). We find this argument difficult to follow. We have just reminded ourselves that the Secretary himself interprets the word compressing, in our Section 7(c), as including loading, unloading, weighing, sampling, tagging, recording. Those are the activities which the defendants perform with regard to the C.I.T. cotton, and they are all exempt activities because "compressing" is exempted by statute. But these are the very same activities which the defendants perform with regard to the non-C.I.T. cotton. The Secretary says that these activities, when carried on with regard to the non-C.I.T. cotton, are not "compressing," which is what Section 7(c) exempts.
 
 
 15
 Section 7(c) could, literally and narrowly, be interpreted as exempting nothing at all except the labor of applying the compressing machine to the cotton. It has not been so interpreted. Once the possible narrow interpretation has been discarded, we think it is not within the delegated authority of the Secretary to draw the line between exempt and non-exempt work wherever he pleases. His drawing of the line must be a reasonable interpretation and implementation of the statute. The intent of Congress is, of course, our only legitimate inquiry. What work did Congress intend to exempt when it wrote an exemption for "an employer engaged in the * * * compressing of cotton"? As the Secretary concedes in his ruling with regard to the "in transit" cotton, the business of compressing cotton meant to Congress many more activities than putting cotton into a compress and applying the pressure of the machine. It meant all the activities which occur at a compressing plant and which relate to the business of compressing. But, as we have seen, those activities, with regard to cotton not in transit, are the same activities which are applied to cotton in transit. They represent what "an employer engaged in the * * * compressing of cotton" does at the "place of employment where he is so engaged."
 
 
 16
 We are obliged to conclude that the line which the Secretary seeks to draw is a completely arbitrary line and is therefore not a permissible interpretation of the Act of Congress. Further, the Secretary's line would, we should suppose, have the practical effect of largely destroying the compressing exemption, except possibly for the small group of employees who work on the compressing machines themselves. We suppose it would be uneconomical and impractical for an operator of a compressing plant to have a separate staff to unload, weigh, sample, tag, record, move to storage, move out of storage, do the office work, with regard to the "in transit" cotton and a different staff which does exactly the same work with regard to the cotton not in transit. The doctrine that "if the employee during any part of the workweek for which the exemption is claimed does any work which does not fall within the scope of the exemption," Fleming v. Swift & Co., N.D.Ill., 41 F.Supp. 825, would forfeit the exemption even as to employees who worked most of their time on "in transit cotton" if they worked any time at all on cotton not in transit.
 
 
 17
 The Secretary claims the benefit of the doctrine that a consistent administrative interpretation of the statute is at the least entitled to great weight as part of "a body of experience and informed judgment." Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124. After the enactment in 1938 of the Fair Labor Standards Act, the Administrator, in Interpretative Bulletin No. 14, Section 16, ruled that "the storage of cotton, either before or after compressing," was not included within the Section 7(c) exemption. If in fact Section 7(c) was so administered, it would seem that few employees at a compressing plant would have come within the exemption, since those who unloaded, weighed, sampled, tagged, etc., as well as the whole office force, would have been working in activities closely related to storing. According to the Secretary's brief, "In 1958 [the Administrator] clarified further that storing would not be exempt as `necessary incidents' to compressing, except for `transit storage or similar temporary storage of cotton awaiting compressing, or awaiting loading out after compressing.'" Oct. 22, 1958, 29 C.F.R. 780.953. We think there has not been a consistent and acquiescedin administrative interpretation of Section 7(c), at least with regard to compressing cotton, which helps us to interpret the section. The fact that in these instant cases, litigated twenty-six years after the enactment of the statute, the Government is urging an interpretation of the statute which, to say the least, is not an obviously correct one, but can cite no helpful precedent for its interpretation, seems to us to show a lack of consistency and acquiescence.
 
 
 18
 The Government has cited a number of decisions but we, like the District Court, have not found them helpful. The cases of Fleming v. Swift & Co., N.D.Ill., 41 F.Supp. 825, and Shain v. Armour & Co., W.D.Ky., 50 F.Supp. 907, were cases in which the employer claimed that Section 7(c) created an "employer exemption," so that whatever non-exempt work was done was thereby made exempt. We have discussed the "employer exemption" claim hereinabove and rejected it. In Shain v. Armour & Co., supra, the employer's dairy plant was relying upon the following language of Section 7(c), "In the case of an employer engaged in the first processing of milk, etc., into dairy products" (italics added), there shall be the exemption. The plant did, in the main, process milk brought in from its area into butter and other milk products. But it also tested, cooled, cut and packaged butter which had been churned elsewhere and was brought into this plant in tubs. It could not, of course, possibly be said that cream separated elsewhere from the milk which contained it, and then churned into butter which was packed in tubs, and only then was carried to the Armour plant, was being "first processed" when the butter was removed from the tubs, re-cut, packaged, etc. This was, under Section 7(c), as non-exempt as making shoes in the dairy would have been.
 
 
 19
 In Armour, supra, there was also the question whether the Section 7(c) seasonal 14 weeks' exemption from overtime applicable to "handling, slaughtering and dressing of poultry" applied to employees in the plant who performed further operations on the poultry after it was dressed. See also Fleming v. Swift & Co., supra.
 
 
 20
 These decisions and others of similar import are not in point. Our problem, as we have said, is that of interpreting Section 7(c) in its application to the compressing of cotton. In Armour, supra, by no process of interpretation could the processing of butter churned elsewhere and brought to the plant in tubs have been regarded as the "first processing" of the milk from which the cream had been taken and churned into the butter which arrived at the asserted "first processing" plant in a tub. Likewise, "in handling, slaughtering or dressing of poultry" was said by the courts in Armour, and Swift, not to be susceptible of an interpretation which would cover many processes performed on the dressed carcasses after the "handling, slaughtering and dressing" had been completed.
 
 
 21
 In our instant situation the various activities carried on at the defendants' plants are the things which are normally done at compressing plants. The exemptions written into the Fair Labor Standards Act were vigorously contested by the spokesmen for the Government, and were vigorously insisted upon by powerful interests which knew their industries and their methods of operation. Since, as the Administrator himself concluded after twenty years of administration of the Act, all the activities here in question fall within the meaning, in the circumstances, of "compressing cotton" as that expression is used by Congress in Section 7(c), we are not willing to hold that Congress desired that the Administrator could draw an arbitrary line wherever he pleased within the area of these activities, even though his drawing that line would have the practical effect of making substantially all the activities which he himself had defined as exempt, in fact non-exempt because of the intermingling of the activities by workmen who crossed the arbitrary line.
 
 
 22
 We see nothing in the legislative history of Section 7(c) to indicate that Congress was not willing that storing cotton, occurring incidentally to its compressing, should be exempt. As the Secretary's brief shows, there were proposals to make the cotton exemptions much broader than they were finally made. See H.Rep. No. 1452, 75th Cong. 1st Sess. p. 3; 82 Cong.Rec. 1776; 81 Cong.Rec. 7887. If the word storing had been left in § 7(c) along with ginning and compressing, the disjunctive interpretation which has been given to ginning and compressing would have made storing, merely as such, an exempt activity. If so, the exemption would have applied, in 1958, to about 1150 cotton warehouses. There were about 305 plants such as those of defendants, i. e., containing compresses. The latter types of plants are larger than the former. Harry Bates Brown, Cotton, N. Y., p. 442. We are not informed why Congress did not grant the § 7(c) exemption to the plants which merely stored cotton. Whatever the reason, it does not authorize the Secretary or the courts to equalize the economic burdens by removing, by the process of interpretation, the exemption which Section 7(c) gave to employers engaged in compressing cotton.
 
 
 23
 In our opinion, the District Court was right in denying the Secretary's motion for summary judgment and in granting the defendants' similar motions.
 
 
 24
 The judgments of the District Court are affirmed.
 
 
 
 Notes:
 
 
 [1]
 Act of June 25, 1938, c. 676, 52 Stat. 1060, as amended, 29 U.S.C. § 201 et seq
 
 
 [2]
 "In the case of an employer engaged in the first processing of milk, buttermilk, whey, skimmed milk, or cream into dairy products, or in the ginning and compressing of cotton, or in the processing of cottonseed, or in the processing of sugar beets, sugar-beet molasses, sugarcane, or maple sap, into sugar (but not refined sugar) or into sirup, the provisions of subsection (a) shall not apply to his employees in any place of employment where he is so engaged; and in the case of an employer engaged in the first processing of, or in canning or packing, perishable or seasonal fresh fruits or vegetables, or in the first processing, within the area of production (as defined by the Secretary), of any agricultural or horticultural commodity during seasonal operations, or in handling, slaughtering, or dressing poultry or livestock, the provisions of subsection (a), during a period or periods of not more than fourteen workweeks in the aggregate in any calendar year, shall not apply to his employees in any place of employment where he is so engaged."