**PAN AMERICAN WORLD AIRWAYS, INC., Appellant,**

v.

**UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA, etc., et al., Appellees.**

**No. 18822.**

United States Court of Appeals Ninth Circuit.

Nov. 5, 1963.

**218**

Poletti, Freidin, Prashker & Harnett, and Jesse Freidin, New York City, Pillsbury, Madison & Sutro, and Eugene M. Prince, San Francisco, Cal., for appellant.

Carroll, Davis, Burdick & McDonough, and Roland C. Davis, San Francisco, Cal., for appellee Culinary Workers Union, Local 226.

George Rudiak, Las Vegas, Nev., for appellee Building and Construction Trades Council, etc.

Before MADDEN, Judge of the Court of Claims, and HAMLIN and BROWNING, Circuit Judges.

MADDEN, Judge of the Court of Claims.

This is an appeal from an order of the United States District Court for the District of Nevada, denying the plaintiff Pan American's motion under Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction against the defendant Brotherhood's labor organization and certain individually named respondents restraining them from striking, picketing, and otherwise interfering with Pan American's operations at the Nuclear Research Development Station (NRDS) at Jackass Flats, Nevada.

If the labor law applicable to Pan American's enterprise at this location was the ordinary federal law applicable to most industrial enterprises of substantial size, the District Court was right in denying the injunction because the Norris-La Guardia Act, 29 U.S.C. § 101 et seq., forbids the issuance of an injunction in cases of labor disputes in such enterprises, in the circumstances of this case. Pan American's contention is that the generally applicable labor law did not apply to its situation; that the special provisions of the federal Railway Labor Act, 45 U.S.C. § 151 et seq., were the applicable law in its case, and that under that law it was entitled to its injunction. If Pan American is correct as to which law is applicable, the injunction should have been granted.

The District Court, though denying the motion for a preliminary injunction, granted a ten-day stay to preserve the status quo pending Pan American's appeal to this court. Rule 62(e), Fed.R. Civ.P. The appeal was taken in time under 28 U.S.C. § 1292(a) (1); and Pan American made a motion in this court for an interlocutory injunction pending appeal, under 28 U.S.C. § 1651(a) and Rule 62(g), Fed.R.Civ.P. The motion was granted, and the appeal has now been heard.

The Railway Labor Act, which Pan American says is the applicable law in this case, when it was enacted in 1926, applied only to railroads. This original part of the Act is in 45 U.S.C. §§ 151–163. In 1936 the Act was amended to include carriers by air. The added sections are §§ 181–188 of 45 U.S.C. Sections 181 and 182 provide:

"§ 181. All of the provisions of sections 151, 152, and 154–163 of this title are extended to and shall cover every common carrier by air engaged in interstate or foreign commerce, and every carrier by air transporting mail for or under contract with the United States Govern-

ment, and every air pilot or other person who performs any work as an employee or subordinate official of such carrier or carriers * * *."

"§ 182. The duties, requirements, penalties, benefits, and privileges prescribed and established by the provisions of sections 151, 152 and 154–163 of this title shall apply to said carriers by air and their employees in the same manner and to the same extent as though such carriers and their employees were specifically included within the definition of "carrier" and "employee", respectively, in section 151 of this title."

The reference to section 151 and the other sections of the original act requires that the coverage of the original act be kept in mind in determining the coverage of the new air carrier sections.

Section 151 of 45 U.S.C. in its first paragraph, which is section 1, First, of the Act, says:

"First. The term "carrier" includes any express company, sleeping-car company, carrier by railroad, subject to the Interstate Commerce Act, and any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any equipment or facilities or performs any service (other than trucking service) in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad * * *."

So the Railway Labor Act applies to every carrier by railroad which is subject to the Interstate Commerce Act. And Section 1, Fifth of the RLA, 45 U.S.C. § 151, Fifth, says:

"Fifth. The term "employee" as used herein includes every person in the service of a carrier * * * who performs any work defined as that of an employee or subordinate official in the orders of the Inter-

state Commerce Commission now in effect * * *."

The Interstate Commerce Act, involved here by the foregoing reference to the orders of the Interstate Commerce Commission says, in section 1, 49 U.S.C.:

"The provisions of this chapter shall apply to common carriers engaged in—(a) the transportation of persons or property wholly by railroad."

Because Congress thought that it was necessary that railroad transportation of persons and property should not be interrupted by labor disputes, if those disputes could be settled by negotiation and mediation, and certain other procedures, Congress in the Railway Labor Act, 45 U.S.C. §§ 151a–160 provided for the creation of various boards, for mediation, arbitration, and finally for Emergency Boards to be appointed by the President, when important transportation service is seriously threatened by labor trouble. At the time of the 1926 legislation, there were no federal labor relations statutes applying generally to industry or other important activities in the United States. Railroad labor was by the Railway Labor Act given certain advantages over other labor, but it was subjected to certain restraints, and strikes were forbidden unless and until the mediation and other procedures provided for in the RLA had been followed. If strikes or other labor activities imperiling this continuity of transportation occurred in violation of the RLA they could be enjoined, the Norris-La Guardia Act excepting such unlawful activities from its prohibition of injunctions.

The air transportation industry was, then, in effect subjected to the labor provisions of the RLA by the 1936 amendments.

In our instant case, Pan American's operation at the Nuclear Research Development Station where the labor troubles with which we are concerned occurred, had nothing to do with transportation by air or by rail. The United States Atomic Energy Commission had in June, 1963, awarded to Pan American

a contract for "housekeeping" and general support services at the Commission's station located at its Nevada Test Site at Jackass Flats. Pan American's work was the preventive maintenance of electrical, electronic and ventilation equipment and such technical functions as the storage and use of liquids, fuels and gases. The work is in connection with the development of a nuclear rocket engine to be used for the propulsion of space vehicles.

It would seem, then, that the same problem of interpretation and application of the pertinent statutes would be presented, if Pan American's management had acquired and were operating a shoe factory for profit. Would the employees in that factory be obliged to comply with the waiting periods and mediation provisions of the Railway Labor Act before they would be free to do what the employees in a clothing factory across the street from them were guaranteed the right to do, viz. to strike if they were not bound by contract not to strike?

■ The purpose of the restrictive provisions of the Railway Labor Act is to keep transportation moving. If the Act has the effect of keeping employees in a shoe factory working against their will, it would seem that the effect of the Act is not coincident with its purpose. Pan American urges us to keep our attention on the text of the legislation; that the legislation says, in section 1, Fifth, 45 U.S.C. § 151, Fifth:

> "The term 'employee' as used herein includes every person in the service of a carrier."

Pan American says, obviously correctly, that it is a carrier, hence the person who works in its shoe factory, or in its NRDS enterprise is an employee within the meaning of the RLA. Even literally and textually the matter is not quite that simple, because the section says more than we have quoted above. It says:

> "The term 'employee' as used herein includes every person in the service of a carrier * * * who performs any work defined as that of an employee * * * in the

orders of the Interstate Commerce Commission now in effect."

We suppose that the Interstate Commerce Commission did not have in effect any orders relating to employees in a shoe factory, even though the shoe factory happened to be owned by a railroad.

The defendants point to § 151, hereinbefore quoted, which defines the word "carrier" as used in the RLA as including not only railroads themselves, but

> "any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any equipment or facilities or performs any service in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad * * *."

The statute thus made certain that railroads could not escape the application of the statute to activities closely related to railroad transportation, by having those activities carried on by subsidiary or controlled enterprises. Here the attention of the statute was upon transportation and activities accessory to transportation. Would Congress at the same time and in the same statute, in § 151, Fifth, have intended to make the coverage of the word "employee" in the Act depend, not at all upon the employee's relation to transportation, but upon the logically irrelevant fact that his employer owned a railroad, in addition to the shoe factory in which the "employee" worked?

There are two quite different bodies of federal labor law, the law of the Railway Labor Act for railroad and airline employees, and the law of the National Labor Relations Act and the Fair Labor Standards Act for most other employees.

The Supreme Court of the United States said in California v. Taylor, 353 U.S. 553 at pages 565 and 566, 77 S.Ct. 1037, at pages 1044 and 1045, 1 L.Ed.2d 1034:

> "The Railroad Labor Act is essentially an instrument of industry-

wide government. See Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 749, 751, [65 S.Ct. 1282, 89 L.Ed. 1886, 1908, 1909] (dissenting opinion). The railroad world for which the Act was designed has been described as 'a state within a state. Its population of some three million, if we include the families of workers, has its own customs and its own vocabulary, and lives according to rules of its own making.'

\* \* \*

"Congress has not only carved this singular industry out of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 USC § 182, but it has provided, by the Railway Labor Act, techniques peculiar to that industry. An extended period of congressional experimentation in the field of railway labor legislation resulted in the Railway Labor Act and produced its machinery for conciliation, mediation, arbitration and adjustments of disputes."

An intent on the part of Congress to lift the employees of our hypothetical shoe factory, or of our actual Nuclear Research Development Station, out of the legal area occupied by most other workmen in the country who do exactly the same work under exactly the same conditions and surroundings, and place them, for employment relations purposes, in the "state within a state" occupied by railroad and air transportation workers would be so incongruous as to suggest that there must be some reason, though not readily apparent, why Congress entertained such an intent.

Research of counsel has produced no such reason, and has left us facing the problem of whether a highly specialized and distinct set of labor laws tailor-made for employees engaged in transportation of persons and goods should be applied to other employees having nothing whatever to do with the transportation of persons and goods. We do not have here a problem of determining whether the relationship of these employees to transportation is "tenuous," "remote" or "negligible." [1] In our case the relationship is nonexistent. If, then, these employees are governed by the Railway Labor Act, it is because Congress has said that they should be so governed. That is what Pan American urges. But our analysis of the pertinent statutes earlier in this opinion convinces us that Congress has not said that so unequivocally as to leave no room for an interpretation of the statutes which will produce a reasonable, and not a merely arbitrary result.

We suggest, in passing, that the defendant unions see somewhat more relevance to our problem than we do in the Supreme Court's decision in the Virginian Railway case. That case was decided on March 29, 1937. The question was whether the federal statute, the Railway Labor Act, was applicable to the "back-shop" employees of the railroad who kept the railroad's engines and equipment in repair so that they could be returned to use in transportation. The Court was, as Pan American says, dealing with a question, not of statutory interpretation, not of deciding whether one federal statute rather than another was applicable to these back-shop employees, but whether the federal Commerce Power was broad enough to permit Congress to regulate these back-shop labor relations at all. To be sure, the Supreme Court two weeks later, on April 12, 1937, issued its decision in the case of National Labor Relations Board v. Jones & Laughlin Steel Co., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, giving such a broad scope to the Commerce Power as to remove any doubt with regard to federal power in such a situation as that in Virginian. But at the time of the decision in Virginian it was necessary to show the substantial tangible relation between the back-shop work and the movement of trains in commerce, in order to satisfy the then exist-

1. See Virginian R. Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789.

ing requirements of Constitutional doctrine.

There has been some litigation involving questions at least analogous to our question. In Northwest Airlines, Inc., 47 NLRB 498 (1943) the National Labor Relations Board said:

"* * * We therefore reject the foregoing argument of the Company, which would lead to the result that all activities of a concern are exempt from the provisions of the Act (the National Labor Relations Act) if it (the Company) operates to any extent, however, incidental, as a carrier by air."

The NLRB held, however, that in that case there was some substantial relation between the airline's activities there involved and its transportation functions, and therefore, since the National Mediation Board had not waived jurisdiction, dismissed the case.

In 1955 a union filed a petition with the NLRB for an election among Pan American's employees at Cape Canaveral, Florida, who performed work substantially identical with that performed at the Nuclear Research station in Nevada, involved in our instant case. The NLRB conducted a hearing upon the petition and then submitted the transcript of its proceedings to the National Mediation Board, the agency which administers the Railway Labor Act. The NMB advised the NLRB that in its opinion the Canaveral operation of Pan American was within the scope of the Railway Labor Act, and that the NMB therefore had jurisdiction over it. The NLRB acquiesced in the NMB's claim of jurisdiction and dismissed the union's petition. It said, 115 NLRB 493:

"We, therefore, affirm our opinion in Northwest Airlines, Inc. [47 NL RB 498 (1943)] that unless the NMB definitely declines to assume jurisdiction over such disputed airline employees, the Board will not assert jurisdiction. Accordingly we shall dismiss the petition."

The union there involved then argued before the NMB that the RLA was inapplicable. The NMB rejected the argument, in a long opinion, NMB File No. C–2202, which, we confess with deference, does not seem persuasive to us. In the course of the opinion the NMB said:

"The test is simple: Is the employer a common carrier by air engaged in interstate commerce? Does the individual perform any work as an employee? If both answers are in the affirmative, the Board's jurisdiction is clear."

In short, the NMB's stated view was that if an employee works for an airline as a pilot, a ground crew member, or a bench worker in the airline's shoe factory having no remotest relation to its business as an air carrier, he is governed by the distinctive set of labor laws written in the Railway Labor Act and administered by the National Mediation Board.

The union in the Canaveral case and some of its members sought declaratory and injunctive relief against the assumption of jurisdiction by the NMB, in the United States District Court for the District of Columbia. That court dismissed their suit, in the case of Biswanger v. Boyd, 32 CCH Labor cases ¶ 70,840, saying, inter alia:

"The Court therefore concludes that the Act (RLA) is applicable and the asserted jurisdiction of the National Mediation Board is not only lawful but compulsive."

In the courts, the most significant litigation occurred in the Eighth Circuit. In the case of Jackson v. Northwest Airlines, 70 F.Supp. 501 (1947) the United States District Court for the District of Minnesota, in an opinion by Judge Nordbye, held that the Fair Labor Standards Act, and not the Railway Labor Act, applied to the length of the work week of employees who worked for an airline but whose work had no relation to air transportation. The FLSA provided for overtime pay for work above 40

hours in a week. The RLA provided for overtime for work above 48 hours. The FLSA, in its section 13(a), 29 U.S.C. § 213(b), says that its provisions shall not apply * * * to (4) any employee of a carrier by air subject to the provisions of title II of the Railway Labor Act.

The question before the court in the Northwest Airlines case was the question which is before us. The Fair Labor Standards Act, like the National Labor Relations Act, applies to the generality of labor in the United States. The FLSA covers the subjects of wages, hours of work and conditions of employment. The NLRA covers the subjects of union organizations, collective bargaining, the proper bargaining unit and the selection of the representative union. Both these generally applicable statutes are important charters of rights of working people. The Railway Labor Act is also an important charter for working people, but it is specially made for those who work in the transportation industry, and is so made for the purpose of assuring that transportation may not be interrupted.

We regard the District Court's decision in Northwest Airlines as directly in point. In further proceedings in the District Court, the court, 76 F.Supp. 121, rejected Northwest's asserted defense that its failure to comply with the FLSA was due to reliance upon an administrative ruling of an agency of the United States, a defense authorized in proper cases by the Portal to Portal Act.

Northwest Airlines appealed to the United States Court of Appeals for the Eighth Circuit. The court in Northwest Airlines v. Jackson, 185 F.2d 74 (8 Cir. 1950), approved the District Court's conclusion that the Railway Labor Act did not apply to Northwest's non-transportation activities, but reversed the District Court's determination that Northwest did not have a defense under the Portal to Portal Act.

In the Court of Appeals' opinion in Northwest Airlines this language from the District Court's opinion is quoted with approval:

"The Railway Labor Act was intended to apply only to transportation activities and that work which bears more than a tenuous, negligible and remote relationship to the transportation activities. It was not intended to apply to all work, regardless of its connection to transportation, merely because the company carrying on the work included carrier activities within its company functions."

This opinion, already too long, will not be extended by a discussion of the numerous other precedents cited by the parties. None of them are very pertinent to our problem.

The order of the District Court is affirmed.[2]

2. After the foregoing opinion was written, the court was advised that the National Mediation Board, on October 29, 1963, decided that it was required by the Railway Labor Act to assert jurisdiction over the project involved in this litigation.

The Board stated no reason for its conclusion except the reason given by it in the Canaveral case, discussed in our opinion. We adhere, therefore, to what we had decided before receiving the advice referred to above.