Laurence G. RUSSELL, William L. Hanna and Eddie D. Langwell, Plaintiffs-Appellants,

v.

NATIONAL MEDIATION BOARD, the Atchison, Topeka and Santa Fe Railway Company, et al., Defendants-Appellees.

No. 82–1466.

United States Court of Appeals, Fifth Circuit.

Sept. 22, 1983.

Rehearing and Rehearing En Banc Denied Nov. 28, 1983.

Robert F. Gore, Nat'l Right to Work Legal Defense Foundation, Inc., Springfield, Va., John Cosmic, Amarillo, Tex., for plaintiffs-appellants.

Ann Sheadel, Atty., Dept. of Justice, Washington, D.C., for National Mediation Bd.

Joseph Guerrieri, Jr., John J. Sullivan, Washington, D.C., for Broth. of Railway, etc.

Before RUBIN and JOLLY, Circuit Judges, and PUTNAM *, District Judge.

E. GRADY JOLLY, Circuit Judge:

This case, one of first impression, involves the question of whether jurisdiction exists under the Railway Labor Act, 45 U.S.C. §§ 151–188, to review refusal by the National Mediation Board to process an employee's application to hold an election among a class of employees after the Board determined that those employees apparently desired to terminate collective representation. We find that while judicial review of Board actions is limited, jurisdiction does exist to compel compliance with the Act. We find further that the Board has here failed to fulfill its statutory duty to investigate a representational dispute so as to allow full and free expression of employee desires with regard to collective representation. Jurisdiction exists, therefore, and we reverse the lower court and remand this case for disposition consistent herewith.

## I.

In June 1943 the police officers and special agents below the rank of captain on the Atchison, Topeka and Santa Fe Railroad elected to be represented under the Railway Labor Act by the National Council of Railway Patrolmen's Union, AFL. This selection was certified by the Board in Case R–1091 (1943).

As revealed by the record, the employees in the bargaining unit over the years apparently considered the union a good representative. No attempt was made, prior to the events involved here, either to oust the union or to replace it with another union. No subsequent ratification of the union's representation has ever been made, even when the Railway Patrolmen's Union was replaced as the collective bargaining representative by its successor in interest, the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees ["BRAC"].

For whatever reason, however, this era of good feelings between BRAC and the Santa Fe police officers became inclement in 1980. In the wake of similar efforts by other Santa Fe employee groups, some of the officers formed an "Association of Santa Fe Railway Police Officers." On January 4, 1981, the Association mailed a letter to members of the bargaining unit soliciting their support in the attempt to "discertify" BRAC as the collective bargaining representative. According to the letter, the Association "will have its own representation, with collective bargaining rights, to bargain for our own needs, not those of the clerks." A follow-up letter on February 22, 1981, from two of the plaintiffs and a third bargaining unit employee indicated that response to the January 14 letter had been favorable and proposed selection of "a rank and file employee," Larry Russell, as the unit's representative "for purposes of getting us placed in the 'exempt employees' category." The letter indicated that such "exemption" should "result in improved benefits and conditions ...." The letter included a detailed list of proposed salary terms and conditions of employment. The last "proposal" stated that "[a]ll agreements, rules, practices, interpretations, and/or understandings, however established, shall be abrogated ...." Also included with the letter was an authorization card designating Larry Russell as representative "for all purposes under the Railway Labor Act." According to the plaintiff's brief, BRAC responded to the Febru-

---

* District Judge of the Western District of Louisiana, sitting by designation.

ary 22 letter with two letters in opposition to the proposed rejection of BRAC as collective bargaining agent. These letters, however, are not included in the record.

In response to the second letter, 113 cards were returned "authorizing" Larry Russell to serve as "representative" for the employee unit. According to the plaintiffs, the unit comprised 210 employees and, thus, also according to the plaintiffs, a majority of the employees desired to be "exempt," i.e., desired no permanent collective bargaining representative.

Armed with the authorization cards, on March 21, 1981, Russell filed an "Application for Investigation of Representational Dispute" with the Board. The application stated that "a dispute has arisen among the employees of [Santa Fe] as to who are the representatives . . . designated and authorized in accordance with the requirements of the Railway Labor Act." Russell requested that the Board "investigate this dispute and certify the name or names of the individuals or organizations authorized to represent the employees involved in accordance with Section 2, Ninth, of the Act."

The Board requested responses to Russell's application from Santa Fe and BRAC. BRAC filed a Statement of Position, opposing the application on the grounds that "(1) Russell's application in effect constitutes a petition for decertification," not authorized by the Act; "(2) Russell lacks any intention to act as the 'representative' of employees, as that term is used in the Railway Labor Act;" and (3) Santa Fe had "assisted and encouraged, if not initiated and orchestrated," Russell's application.

In a significant portion of its statement, BRAC discussed three previous Board cases in which a Santa Fe employee, acting on behalf of his craft or class of employees, had sought to oust the incumbent union, abrogate the collective bargaining agreement, and then have the Board revoke the certification, thereby leaving the employees unrepresented.[1]

The Board received the statements and evidence from BRAC and Santa Fe, as well as a statement from the plaintiffs in response to BRAC's statement. The Board also considered a documented telephone conversation between the chief hearing officer for the Board and Russell's attorney. According to the officer's report, dated April 13, 1981, the attorney indicated that Russell intended "to do what McDaniel did with the Yardmasters . . ., namely, win, negotiate an 'exempt' status and walk away from his status as a representative." Among other things, the hearing officer told Russell's attorney that "the Board could dismiss an application any time it found a lack of intent to represent employees."

The other items of information considered by the Board in its investigation

---

1. As indicated in BRAC's Statement of Position, in Case No. R–5039, an individual, J.J. McDaniel, acting on behalf of Santa Fe's yardmasters, had been certified by the Board after a Board election as the bargaining representative on March 31, 1980, to replace the Railroad Yardmasters of America. McDaniel abrogated the collective bargaining agreement with Santa Fe. On July 1, 1980, at McDaniel's request, the Board revoked McDaniel's certification, thereby leaving the employees unrepresented.

In Case No. R–5123, Raul Herrera was elected to represent the yardmasters employed by a Santa Fe subsidiary, Los Angeles Junction Railway Co. Herrera was certified as the representative on September 22, 1980. After abrogating the collective bargaining agreement, Herrera requested revocation of his certification. That request remains pending.

*In the Matter of the Application of J.D. Blankenship,* 8 NMB No. 18 (Oct. 20, 1980), involved an attempt by Blankenship to be certified as the representative for the class or craft of Santa Fe's dispatchers. The authorization cards distributed by Blankenship provided that he was to undertake "whatever processes are necessary to discertify [sic] my current application with the American Train Disptachers Association and to pursue whatever course of action is necessary to become an exempt employee of the Santa Fe . . . ." The Board dismissed the application on the grounds that the Act does not provide for "decertification" of a union.

On October 28, 1980, the Board issued a Notice of Hearing to determine whether there was any impropriety "on the part of the employee representatives and the carriers" involved in the McDaniel, Herrera and Blankenship cases. Insofar as the record reveals, that inquiry is pending.

were three letters, verbatim copies each of the others, dated April 17, 1981, from Russell to his congressman, Representative Hightower, and to his two senators, Senator Tower and Senator Bentsen. These letters, consistent with the representation made by Russell's attorney to the Board's chief hearing officer, complained that the Board's officer had indicated that Russell could not be elected despite the employees' desire to elect him.

Consideration of these items was the extent of the Board's investigation. On May 21, 1981, the Board issued an order dismissing Russell's application. In pertinent part, that order stated:

> The Board finds that Laurence G. Russell lacks an intent to represent the subject craft or class if elected and certified, as evidenced by his announced and undisputed plan to abrogate all existing collective bargaining agreements, thereby leaving the employees unrepresented *in effect*, notwithstanding the certification and the obligations which attach thereto.

The order declared that, absent intent to represent, certification was not appropriate under the Act:

> The Railway Labor Act, unlike the National Labor Relations Act, contains no statutory provision for decertification of a bargaining representative. [ATSF], 8 NMB No. 18 (1980) [the Blankenship case]. *See also, Manufacturers Railway Company,* 7 NMB Nos. 233 and 250 (1980). The Board will not progress an application for investigation of a representation dispute where the applicant lacks the intent to represent the craft or class, if certified. *Chicago Union Station,* 8 NMB No. 45 (1980), and will dismiss such an application because it is void *ab initio. Id.*

## II.

Russell *et al.* filed this suit in July 1981 alleging two causes of action. The plaintiffs sought a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that the Board's actions were unlawful, arbitrary and capricious, an abuse of discretion, in excess of statutory authority and violative of the plaintiffs' first amendment right to freedom of association. Also, a writ of mandamus was sought to compel the Board to hold a representational election.

The second cause of action sought an injunction directed to BRAC and Santa Fe to invalidate the union security agreement, at least until a representational election were held, requiring membership in BRAC as a condition of employment with Santa Fe.

The Board filed a Motion for Summary Judgment urging that the district court lacked jurisdiction to review its action. The district court granted that motion, holding that "[i]t is well established that [the Board's] decisions regarding representational disputes, made pursuant to Section 2, Ninth, of the Railway Labor Act, are not subject to judicial review." The lower court found "two limited exceptions" to this judicial bar: where the Board's action violates a party's constitutional rights and where it acts "'in excess of its powers or contrary to a statutory mandate.'" (Citations omitted.) The court found that neither exception was present, holding that the Board's investigation was "sufficient and within its scope of authority," and that the investigation met the constitutional due process requirements.

The plaintiffs filed a timely appeal, challenging only the grant of the Board's motion for summary judgment.[2]

## III.

The Board's refusal to "progress" Russell's Application for Investigation of Representational Dispute was based on the Board's determination that Russell was seeking a back door method of decertification, for which the Act does not provide. Collective representation is necessary, the

---

**2.** Subsequent to granting the Board's summary judgment motion, the lower court granted BRAC's unopposed motion for summary judgment and Santa Fe's unopposed motion to dismiss.

Board argues, to assure the avoidance of strikes and transportation stoppages. Such avoidance is the "heart" of the Act. If the employees are not collectively represented, according to the Board, their only resort in the event of a dispute with management is to strike. The Board argues, therefore, that its policy in this case of precluding nonrepresentation of these employees falls squarely within its statutory mandate and is therefore outside our jurisdiction. As to the plaintiffs' constitutional argument, the Board simply argues that the provisions of the Act have been held constitutional, that the Board is acting consistently with those provisions, and therefore no constitutional rights have been violated.

■ The plaintiffs argue that the Board's policy violates the employees' statutory right to choose whether or not they wish to be collectively represented.[3] They point out that none of the current members of the craft was a member in 1943 when unionization was initially chosen. According to the plaintiffs, the language of the Act, its legislative history and judicial precedent all provide employees a right to have or not to have collective representation. The plaintiffs argue that the Board's refusal to allow them their right to choose whether or not they are to be collectively represented violates the Board's statutory mandate. Also, the plaintiffs argue that the Board's policy violates their first amendment right to freedom to associate or not to associate.

#### IV.

Three principal issues are presented for our consideration: whether jurisdiction ex-

ists for review of the Board's action in a representational dispute; whether the Act requires a representational election even when that election might result in the selection of nonrepresentation; and whether the Board here, by refusing to "progress" Russell's application, violated its statutory mandate.

#### V.

We must first determine the extent, if any, to which this court may review the Board's actions here.

The starting point in considering the proper scope of this court's jurisdiction is the Railway Labor Act trilogy of *Switchmen's Union v. NMB,* 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943); *General Committee of Adjustment of Brotherhood of Locomotive Engineers v. Missouri-K.T.R.R.,* 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943); and *General Committee of Adjustment of Brotherhood of Locomotive Engineers v. Southern Pacific Co.,* 320 U.S. 338, 64 S.Ct. 142, 88 L.Ed. 85 (1943). In *Switchmen's Union* the union opposed the Board's determination as to which yardmen should vote in a representation election. The union brought suit to have the certification of the collective bargaining representative set aside. The district court upheld the Board's decision and was upheld by the court of appeals. The Supreme Court held that the district court did not have jurisdiction to review the Board's action.

Reviewing the legislative history of the Railway Labor Act, the Court held that Congress clearly intended that the Board would be the final arbiter of representa-

---

**3.** The plaintiffs point out that the Board has, prior to 1980, allowed employees to opt-out of collective representation by the "straw man" procedure sought to be used here. The plaintiffs cite eight Board cases in which this method was successful, including the J.J. McDaniel case, Case R–5039 (1980), discussed *supra* at note 1. The Board argues that it has never authorized "straw man" *un* certification, but rather considered that the persons seeking certification in those cases intended to remain as bona fide bargaining representatives. The plaintiffs point out that the "straw man" procedure is well known among Board pundits, cit-

ing GOHMANN, ARBITRATION AND REPRESENTATION: APPLICATIONS IN AIR AND RAIL LABOR RELATIONS 29 (1981) (outlining "awkward" method of decertification by individual employee standing for election).

Regardless of whether true precedent exists, however, the Board has clear authority to change its own procedures, so long as such changes comply with the requirements of the Act. *Brotherhood of Locomotive Firemen and Enginemen v. Kenan,* 87 F.2d 651, 654 (5th Cir.), *cert. denied,* 301 U.S. 687, 57 S.Ct. 790, 81 L.Ed. 1344 (1937).

tional disputes. Noting the background of arbitration and mediation which existed for resolution of railway labor problems, the Court in *Switchmen's* found "highly relevant" the legislative history of section 2, Ninth, of the Act.[4] 320 U.S. at 302, 64 S.Ct. at 98.

The Court found that the legislative history of the Act and the specific language of section 2, Ninth, demonstrated convincingly that the Board was to be " 'a neutral tribunal which can make the decision [as to the proper representative of an employee group] and get the matter settled.' " *Id.* at 303, 64 S.Ct. at 98 (quoting Commissioner Joseph B. Eastman, Federal Coordinator of Transportation and principal draftsman of the 1934 amendments to the Act). The Court noted that the provision whereby the Board could appoint a three-person committee to designate which employees should participate in a representation election was included "so that the Board's 'own usefulness of settling disputes that might arise thereafter might not be impaired.' S.Rep. No. 1065, 73d Cong., 2d Sess., p. 3." *Id.*

Where Congress took such great pains to protect the Mediation Board in its handling of an explosive problem, we cannot help but believe that if Congress had desired to implicate the federal judiciary and to place on the federal courts the burden of having the final say on any aspect of the problem, it would have made its desire plain.

*Id.* The Court went on to find that, having no subpoena or enforcement power, the Board's function "under § 2, Ninth, is more the function of a referee." *Id.* at 304, 64 S.Ct. at 98.

In the present case the authority of the Board in election disputes to interpret the meaning of "craft" as used in the statute is ... clear and ... essential to the performance of its duty. The statutory command that the decision of the Board shall be obeyed is ... explicit. Under this Act Congress did not give the Board discretion to take or withhold action, to grant or deny relief. It gave it no enforcement functions. It was to find the facts and then cease .... [T]he intent seems plain—the dispute was to reach its last terminal point when the administrative finding was made. There was to be no dragging out of the controversy into other tribunals of law.

*Id.* at 305, 64 S.Ct. at 99.[5]

 Consistent with *Switchmen's Union,* the courts have universally agreed that

---

4. 45 U.S.C. § 152, Ninth, reads as follows:

Ninth. If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter. In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier. In the conduct of any election for the purposes herein indicated the Board shall designate who may participate in the election and establish the rules to govern the election, or may appoint a committee of three neutral persons who after hearing shall within ten days designate the employees who may participate in the election. The Board shall have access to and have power to make copies of the books and records of the carriers to obtain and utilize such information as may be deemed necessary by it to carry out the purposes and provisions of this paragraph.

5. Perhaps the most persuasive evidence of lack of judicial review over section 2, Ninth, determinations by the Board noted in *Switchmen's Union* is the provision for judicial review in section 3, First, of the Act (suits based on awards by the National Railroad Adjustment Board) and in section 9, Third, of the Act (suits based on awards by a board of arbitration). "When Congress in § 3 and in § 9 provided for judicial review ... and in § 2 of the same Act

the details and procedures of representational disputes are committed solely to the Board's discretion. *British Airways Bd. v. NMB,* 685 F.2d 52, 56 (2d Cir.1982); *Brotherhood of Locomotive Firemen & Enginemen v. Seaboard Coast Line R.R.,* 413 F.2d 19 (5th Cir.), *cert. denied,* 396 U.S. 963, 90 S.Ct. 432, 24 L.Ed.2d 426 (1969); *Teamsters v. BRAC,* 402 F.2d 196, 205 (D.C.Cir.), *cert. denied,* 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968). Courts are not to substitute their judgment for the Board's or "otherwise interfere with its legal function," *Aircraft Mechanics Fraternal Assn. v. United Airlines,* 406 F.Supp. 492, 500 (N.D. Cal.1976), and only the Board can certify or "decertify" a union. *Texidor v. Ceresa,* 590 F.2d 357, 359 (1st Cir.1978). So it is that judicial review of the Board has correctly been analyzed as "sparing." *Sedalia-Marshall-Booneville v. NMB,* 574 F.2d 394, 397 (8th Cir.1978). "Sparing," of course, is not an absolute.

To return for a moment to *Switchmen's Union,* we note that despite the Court's certainty that the Board determinations under section 2, Ninth, were not judicially reviewable, the Court did hint at one notable exception to an almost absolute judicial bar when it stated, *"[a]ll constitutional questions aside,* it is for Congress to determine how the rights which it creates shall be enforced." *Id.* 320 U.S. at 301, 64 S.Ct. at 97. As discussed below, this door left ajar has subsequently been pushed open.

Another opening to the preclusion of judicial review of section 2, Ninth, decisions by the Board was provided in *Switchmen's Union*'s companion case, *General Committee of Adjustment of Brotherhood of Locomotive Engineers v. Missouri-K.T.R.R.* Similar to *Switchmen's Union,* the dispute in this case involved which of two unions

was appropriate to represent a craft of employees in grievance proceedings. The Court again upheld the determination made by the Board, stating that Congress had "fashioned an administrative remedy and left that group of disputes [between unions or between groups of employees] to the Board. If the present dispute falls within § 2, Ninth, the administrative remedy is exclusive." 320 U.S. at 336, 64 S.Ct. at 152. In the footnote to that last passage, however, the Court stated significantly, "[w]hether judicial power may ever be exerted to require the Mediation Board to exercise the 'duty' imposed upon it under § 2, Ninth, and, if so, the type or types of situations in which it may be invoked present questions not involved here." *Id.* at 336 n. 12, 64 S.Ct. at 152.

These two apertures for a judicial "peek at the merits" [6] have been consistently used in the wake of the *Switchmen's Union* trilogy.[7]

The key case on point in this circuit is *United States v. Feaster,* 410 F.2d 1354 (5th Cir.), *cert. denied,* 396 U.S. 962, 90 S.Ct. 427, 24 L.Ed.2d 426 (1969). At issue in *Feaster* was whether the Board erred in making a unit determination. After a thorough analysis of the Act and *Switchmen's Union,* *Feaster* enumerated the limited instances in which judicial review of section 2, Ninth, disputes are allowed. First, judicial interdiction will be permitted where a complaining party makes a "substantial showing" of a violation of that party's constitutional rights as a result of the Board's action. 410 F.2d at 1366, quoting *Boire v. Miami Herald Publishing Co.,* 343 F.2d 17, 21 (5th Cir.), *cert. denied,* 382 U.S. 824, 86 S.Ct. 56, 15 L.Ed.2d 70 (1965). Second, courts may intervene with Board actions which are " 'in excess of its delegated powers and contrary

---

omitted any such provision ... it drew a plain line of distinction." 320 U.S. at 306, 64 S.Ct. at 99.

**6.** *Teamsters v. BRAC,* 402 F.2d at 205.

**7.** In Jaffe, *The Right to Judicial Review,* 71 HARV.L.REV. 401, 430 (1958), *Switchmen's Union*'s temerity is ascribed to "the mood of judicial self-deprecation and abdication into

which the Court of that period had fallen." The article goes on to state that *"Switchmen's Union* has borne little fruit." *But see* 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE 42 (1958), which characterizes *Switchmen's Union* as "[m]uch the most important case holding that a statute inexplicitly precluded judicial review."

to a specific prohibition in the Act.'" 410 F.2d at 1367, quoting *Leedom v. Kyne,* 358 U.S. 184, 188, 79 S.Ct. 180, 184, 3 L.Ed.2d 210 (1958). *Leedom* involved certification by the National Labor Relations Board of a unit of both professional and nonprofessional employees in contravention of the express provision of 29 U.S.C. § 159(b)(1).[8] In holding that the district court had jurisdiction, the Court in *Leedom* stated:

> This suit is not one to "review," in the sense of that term as used in the Act, a decision of the Board made within its jurisdiction. Rather it is one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act .... [The Board's action] was an attempted exercise of power that had been specifically withheld. It deprived the professional employees of a "right" assured to them by Congress. Surely, in these circumstances, a Federal District Court has jurisdiction of an original suit to prevent deprivation of a right so given.

358 U.S. at 188–89, 79 S.Ct. at 184.

After analyzing this language, *Leedom*'s analysis of *Switchmen's Union,* and *Leedom*'s progeny, *Feaster* summed up the *Leedom* exception as follows:

> Under this exception access to the courts is accorded only if the Mediation Board's determination is infused with error which is of a *summa* or *magna* quality as contraposed to decisions which are simply *cum* error. Only the egregious error melds the Board's decision into justiciability. Lesser malignancies thwart the jurisdiction of the courts.

410 F.2d at 1368. Using this "narrow and rarely successfully invoked" standard, *id., Feaster* went on to determine that the Board had not so clearly and egregiously violated a specific prohibition of the Act, by determining that the facility involved was a "carrier" within the meaning of the Act, as to vest jurisdiction.[9]

Numerous court decisions have elaborated on judicial interdiction in Railway Labor Act cases. *See BRAC v. Association for Benefit of Non-Contract Employees,* 380 U.S. 650, 661, 85 S.Ct. 1192, 1998, 14 L.Ed.2d 133 (1965) (judicial review allowed where the Board acts in excess of statutory authority or where review necessary to compel performance by the Board of statutorily mandated duties); *British Airways,* 685 F.2d at 56 (judicial review allowed where the Board contravenes statutory policy); *Teamsters v. BRAC,* 402 F.2d at 205 (jurisdiction present where the Board's action is "'so plainly beyond the bounds of the Act, or ... so clearly in defiance of it, as to warrant the immediate intervention of an equity court'," quoting *Local 130, International Union of Electric, Radio & Machine Workers v. McCulloch,* 345 F.2d 90, 95 (D.C. Cir.1965)); *Air Canada v. NMB,* 478 F.Supp. 615, 616 (S.D.N.Y.1980), *aff'd.,* 107 L.R.R.M. 2049 (2d Cir.), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381 (1981) (determination by the Board in representation dispute final unless in gross violation of statutory policy); *Railway Employees Co-operative Ass'n. v. Atlanta B & C R.R.,* 22 F.Supp. 510, 514 (D.Ga.1938) (court without jurisdiction to review decision "unless it should become absolutely necessary to protect complainants' rights ....").

As a rule, we are not to look over the Board's shoulder in representational disputes. These matters are, apart from exceptional cases, solely the Board's concern. As discussed in *Switchmen's Union,* Congress intended that the Board have the final word in such matters. But where Congress has created a right, the Board cannot destroy that right without intervention by the judiciary. To hold otherwise

---

8. Despite the fact that *Leedom* involved a dispute under the National Labor Relations Act, *Feaster* characterized it as "the only undisputed exception to *Switchmen's* doctrine that Mediation Board decisions in representation matters are unreviewable." 410 F.2d at 1366 n. 11.

9. *Feaster* briefly discussed a third exception to *Switchmen's Union*'s bar, that is, where the issue involves a question of "international urgency." 410 F.2d at 1365. Our review of the applicable case law indicates that this exception has received scant attention. It clearly does not weigh on the instant controversy.

would rob the Act of its vitality and thwart its purpose. 320 U.S. at 300, 64 S.Ct. at 97.

## VI.

In this case, the plaintiffs argue that the Board has violated its own statutory mandate to allow employees their right to full and free expression of their choice regarding collective representation, including the right to reject collective representation. They argue further that the Board's action violates their constitutional right to freedom of association, including the right not to associate. Because we find that the Board has violated its statutory mandate, we need not address the constitutional issue.[10]

## VII.

We believe that the Board breached its clear statutory mandate by not "progressing" Russell's application for investigation into the representational dispute. The process for such "progress" is set forth in 29 C.F.R. § 1206.2(a):

> [W]here the employees involved in a representation dispute are represented by an individual or labor organization ... and are covered by a valid existing contract between such representative and the carrier a showing of proved authorizations (checked and verified as to date, signature, and employment status) from at least a majority of the craft or class must be made before the Board will authorize an election or otherwise determine the representation desires of the employees under the provision of section 2, Ninth, of the Railway Labor Act.

The Board refused to move forward with Russell's application for essentially two reasons. First, the Board determined that Russell did not intend to "represent" the unit employees within the meaning of the Act. Second, to allow the sought election, certification of Russell as the elected collective representative, abrogation of the contract and achievement of nonrepresented status for the craft or class would, according to the Board, violate its statutory duty to achieve the basic purpose of the Act. That purpose, the Board argues, is the avoidance of work stoppages resulting from labor/management disputes. And, in order to avoid those stoppages, collective representation is necessary.

In its first argument the Board defines "intent to represent" as the intent to represent in contract negotiations, contract disputes, grievance procedures, and in all other matters where a labor-management go-between might be effective. Because Russell did not "intend to represent" for all of those purposes and in fact intended ultimately not to represent the employees at all, the Board found that he could not have been a representative and, thus, there existed no "representational dispute."

No doubt, the above-listed functions are the usual, ordinary and anticipated functions of a "representative" under the Act. That Russell did not "intend to represent" his fellow employees in the accustomed fashion, however, does not mean that he did not "intend to represent" them within the meaning of the Act. Section 1, Sixth, defines "representative" as "any person or persons, labor union, organization, or corporation designated either by a carrier ... or by its ... employees, to act for it or them." There are no qualifiers attached to the Act's simple definition of "representative." The "representative" of a craft of employees is, simply, a person or union designated to act on their behalf, to accomplish what they seek to accomplish, and is not necessarily a man for all seasons. As discussed at length below, the Act nowhere *requires* collective representation. To accept the

---

10. When the validity of an act of the Congress is drawn into question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.

*Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1931), quoted in *International Association of Machinists v. Street,* 367 U.S. 740, 749, 81 S.Ct. 1784, 1790, 6 L.Ed.2d 1141 (1961).

Board's definition of "intent to represent" would be to impose such a requirement. A claimed majority of the craft here wanted Russell, apparently, to terminate collective bargaining. Torturous interpretations of "representation" aside, Russell fits the bill.[11]

At oral argument the Board's attorney, in arguing that the Board determined correctly that no representational dispute existed because Russell did not intend to "represent" the craft employees, suggested that the appropriate course of action here would have been for the employees to have petitioned the Board "to hold an election to either vote for the current union representative, BRAC, or, no union." This, of course, is exactly what Russell was requesting, and the Board very well knows it now and knew it at the time Russell applied. In our view, this suggestion is nothing more than playing games with the plaintiffs and with this court.[12] We do not see why the suggested course of action is any more or less objectionable than the action taken by Russell. In fact, the Board's suggested procedure is almost identical to the decertification vote under the National Labor Relations Act, which the Board has stated time and time again is not allowed by the Act.

The second, more substantive argument forwarded by the Board requires more attention. The Board correctly notes that the basic purpose of the Railway Labor Act is

> to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes ... in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152, First. This has been called the "heart" of the Act. *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377–78, 89 S.Ct. 1109, 1114–15, 22 L.Ed.2d 344 (1969). *See also California v. Taylor*, 353 U.S. 553, 565–66, 77 S.Ct. 1037, 1044, 1 L.Ed.2d 1034 (1957) (purpose of Act is to provide for industry-wide government to avoid interruption of national transportation system); *Slocum v. Delaware, L & W R.R.*, 339 U.S. 239, 242–43, 70 S.Ct. 577, 579, 94 L.Ed. 795 (1950) (Act represents a "considered effort on the part of Congress to provide effective and desirable administrative remedies for adjustment of railroad-employee disputes"); *Pan Am World Airways v. Carpenters and Joiners*, 324 F.2d 217, 220 (9th Cir.1963), *cert. denied*, 376 U.S. 964, 84 S.Ct. 1123, 11 L.Ed.2d 982 (1964) (purpose of Act is to keep transportation moving); *Estes, et al. v. Union Terminal Co.*, 89 F.2d 768, 770 (5th Cir.1937) (purpose of Act is "to facilitate peaceful, orderly adjustment of disputes between railroads and their employees, to prevent strikes and other disturbances.").

It cannot be gainsaid that the Act does in fact encourage collective bargaining as the mode by which disputes are to be settled and work stoppages avoided. *Detroit & Toledo S.L.R.R. v. United Transportation Union*, 396 U.S. 142, 148, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969). Under the Act, Congress gave unions "a clearly defined and delineated role to play in effectuating the basic congressional policy of stablizing labor relations in the industry." *International Association of Machinists v. Street*, 367 U.S. 740, 760, 81 S.Ct. 1784, 1795, 6 L.Ed.2d 1141 (1961). When the Act was initially passed in 1926, company-dominated unions were the rule, and, in its early years, the Act was not deemed effective. Thus, in 1934, the Act was amended, with a primary purpose being the strengthening of labor organizations vis-a-vis the carriers.[13]

---

11. The Board would say that the employees are "represented" by someone who does not represent their wishes, and are not "represented" by someone who does represent their wishes. Orwell would understand this perfectly.

12. Equally disturbing is the Board's response, when asked why Russell had not been informed of the "preferred" method of petitioning, that they had never been asked. Mr. Orwell, meet Mr. Kafka.

13. H.R.Rep. No. 1944 to accompany H.R.Rep. No. 9861, Committee on Interstate and Foreign Commerce, 73rd Cong., 2d Sess. 3 (1934) (1934 amendments "in the interest of industrial peace

As stated in *Aircraft Mechanics Fraternal Ass'n.,* 406 F.Supp. at 497, the Board was created because, under the United States Board of Arbitration "[c]ompany unionism ... continued to present a problem. A means was required by which the will of the employees, uninfluenced by the employer, could be ascertained." This is consistent with the second "general purpose" of the Act found at 45 U.S.C. § 151a, namely, "to forbid any limitation upon freedom of association among employees or any denial of the right of employees to join a labor organization"; it is consistent as well with the third general purpose stated in section 151a, to provide "complete independence ... of employees in the matter of self-organization ...." Similarly, section 2, Third, provides for designation of representatives "without interference, influence, or coercion" and section 2, Fourth, provides that "[e]mployees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter." The Board is therefore correct when it argues that the Act supports collective bargaining and when it argues that one of the Board's purposes is to support collective bargaining.

This in no way, however, takes away from the fact that employees were given the right under the Act not only to opt for collective bargaining, but to reject it as well. The language of the Act, quoted above, clearly stands for this proposition. The employees "shall have the *right*" —not the *duty*—to select a collective bargaining representative. They shall have "complete independence" to organize ... or not organize. And while the "heart" of the Act directs that "every reasonable effort" be made "to make and maintain" collective bargaining agreements, it is only every *reasonable* effort which is required. The Act supports but does not require collective bargaining, and in our view, the implicit message throughout the Act is that the "complete independence" of the employees necessarily includes the right to reject collective representation.[14] Indeed, the concept of "complete independence" is inconsistent with forced representation, most especially when that forced representation is at odds with employees' will and desires.

The legislative history of the Act expressly supports this view. In the official House committee report on the proposed amendments, the analysis of section 2 states that "the employees shall be free to join any labor union of their choice and likewise be free to refrain from joining any union if that be their desire ...." H.R.Rep. No. 1944 to accompany H.R. 9861, Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess. 2 (1934). In hearings on

---

and of uninterrupted transportation service."). The 1934 amendments created the Board out of the old United States Board of Mediation, which, in 1926, at the passage of the Act, had in turn replaced the Railroad Labor Board created by the Transportation Act of 1920. 41 Stat. 456 (1920). The Board was given significantly increased powers, especially in representation disputes. For an overview of the history of the Act, *see Ruby v. American Airlines,* 323 F.2d 248, 256 (2d Cir.1963), *cert. denied,* 376 U.S. 913, 84 S.Ct. 658 (1964); and *Aircraft Mechanics Fraternal Ass'n. v. United Airlines,* 406 F.Supp. 492, 497 (N.D.Cal.1976).

**14.** The statement in *Virginian Ry. v. System Federation,* 300 U.S. 515, 548, 57 S.Ct. 592, 599, 81 L.Ed. 789 (1937) (emphasis added) that the aim of the Act is to "secur[e] settlement of labor disputes by *inducing* collective bargaining with the *true representative* of the employees and by preventing such bargaining with any who do not represent them," is consistent with our holding here. The Act *induces,* it does not force, and that inducement applies only to the *true* representative. Likewise, in *Order of Railroad Telegraphers v. Chicago & Northwestern Ry.,* 362 U.S. 330, 337, 80 S.Ct. 761, 765, 4 L.Ed.2d 774 (1960) (emphasis added), the Court stated that "[t]he Railway Labor Act safeguards an *opportunity* for employees to obtain a contract through collective rather than individualistic bargaining." *See also International Association of Machinists v. Northwest Airlines,* 673 F.2d 700, 707 (3rd Cir.1982) (to further goal of ensuring that designation of bargaining representation be free from employer coercion, the Board was "empowered to resolve representational disputes by investigation and certification of the representative that reflected the unfettered choice of the employees.").

H.R. 7650, House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess. 57 (1934), Commissioner Eastman stated that the legislation "does not require collective bargaining on the part of the employees. If the employees do not wish to organize, prefer to deal individually with the management with regard to these matters, why, that course, is left open to them, or it should be." Commissioner Eastman also testified before the Senate that "genuine freedom of choice [is] . . . the basis of labor relations under the Railway Labor Act . . . ." Hearings on S. 3266, Senate Committee on Interstate Commerce, 73d Cong., 2d Sess. 157 (1934). Senator Wagner, later to be the chief architect of the National Labor Relations Act of 1935, stated in hearings on S. 3266 before the Senate, 73d Cong., 2d Sess. 76 (1934), that his understanding of the Act was not that it compelled an employee to join any particular union, but that its purpose "was just the opposite, to see that men have absolute liberty to join or not to join any union or to remain unorganized." And during the relatively brief debate in the House on H.R. 9861, Congressman Crosser, the primary sponsor and floor leader of the bill, stated that "[m]en may organize as they see fit . . . . [The Act] gives employees the absolute freedom to establish unions of employees of a company *if they so desire* . . . ." 78 CONG.REC. 11,713–14 (1934) (emphasis added).

The courts which have examined the issue of employees' rights to reject collective representation are in unanimous agreement that the Act provides such a right. The principal case on point is *BRAC v. Association for Benefit of Non-Contract Employees*, 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965). In that case, involving two unions competing to represent a craft of employees, the Court considered the narrow question of whether the Board's ballot conflicted with the employees' right to vote against representation by either union. The Court had no trouble in determining

that the "legislative history supports the view that the employees are to have the option of rejecting collective representation." 380 U.S. at 669 n. 5, 85 S.Ct. at 1202. Although the Court upheld the ballot form, it had no doubt about the right of employees, although then represented, to opt-out from under representation altogether. In dissent, Justice Stewart objected to the ballot form, which did not contain a "no union" box.[15]

> This ballot form is directly attributable to the Board's view of what the bargaining pattern should be in the airline industry. The Board has stated that "the Act does not contemplate that its purposes shall be achieved, nor is it clear that they can be achieved, without employee representation . . . ." . . . I believe both the language of the Act and its legislative history belie this view and, for that reason, I would order the Board to reconsider the form of its ballot.

380 U.S. at 673, 85 S.Ct. at 1204. Justice Stewart goes on to state that the Act

> furnish[es] the opportunity for majority determination within each employee group of what the nature of bargaining shall be. But the Act is not compulsory. Employees are not required to organize, nor are they required to select labor unions or anyone else as their representatives. It has always been recognized that under the law the employees have the option of rejecting collective representation.

*Id.* at 674, 85 S.Ct. at 1205. In closing, Justice Stewart noted that the Board had "hewn to its mistaken belief that its duty is to encourage collective representation in the airline industry." *Id.* at 677, 85 S.Ct. at 1206.

In *Teamsters v. BRAC,* 402 F.2d 196 (D.C. Cir.), *cert. denied,* 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968), BRAC was the certified bargaining representative for Pan American clerks and office employees.

---

**15.** To indicate opposition to representation by any union, an employee has to withhold casting his or her ballot.

BRAC sought to enjoin the Board from holding an election which would have determined whether the employees desired to be represented by BRAC or by the Teamsters. Two invalid elections were held and a third election scheduled, which BRAC opposed, arguing that "the Board has no power whatever to decertify a union; all it may do is certify some new representative." Because BRAC was to appear on the ballot, and because it was possible that fewer than half of the eligible voters might vote, it was possible that there might be a vote in favor of neither union, thereby rejecting collective representation. BRAC sought to enjoin the ballot, arguing, as the Board argues here, that no procedure for decertification was contained in the Act; therefore, BRAC argued, the ballot was by definition improper. The court cited *BRAC v. Association for Benefit of Non-Contract Employees* as support for the employees' right to reject any collective representation.

It is true ... that that case involved an attempt to unionize employees not then collectively represented, rather than, as here, an attempt by one union to dislodge another. *We agree with counsel for the Board, however, that it is inconceivable that the right to reject collective representation vanishes entirely if the employees of a unit once choose collective representation.* On its face that is a most unlikely rule, especially taking into account the inevitability of substantial turnover of personnel within the unit.

The right of employees to reject collective representation, recognized in *Railway Clerks v. Association [for Benefit of Non-Contract Employees]*, yields as a corollary the Board's implied power to certify to the carrier that in a particular unit the employees have in fact rejected such representation .... The Board has in the past refused to certify a representative, when an election among unorganized employees failed to elicit the votes of 50% of the employees, without any hue and cry that employees must be represented so that the negotiation contem-plated by the Act may go on. The Board may not only decline to certify a representative, but may go further and certify that there is no representative.

402 F.2d at 202–03 (emphasis added).

In *Elgin, J. & E. Ry. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), *modified upon rehearing,* 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946), the employees asserted a back-pay claim under the collective bargaining agreement. The union grievance committee handled the claim and settled with the employer. The employees were not satisfied with the settlement and pursued the matter. The Railroad Adjustment Board approved the settlement as conclusive on the grounds that the union, as the bargaining agent for the employees, had absolute control over such matters. The employees brought suit in federal court under 45 U.S.C. § 153, First (m), which allows suits from Railway Adjustment Board determinations involving money awards.

The Supreme Court held, *inter alia,* that because the employees had been denied any participation in the settlement and in the action before the Board, their rights under the Act individually to express their grievances had been denied.

It would be difficult to believe that Congress intended, by the 1934 amendments, to submerge wholly the individual and minority interests, with all power to act concerning them, in the collective interest and agency .... Acceptance of such a view would require the clearest expression of purpose. *For this would mean that Congress had nullified all preexisting rights of workers to act in relation to their employment* ... except as the collective agent might permit. Apart from the question of validity, the conclusion that Congress intended such consequences could be accepted only if it were clear that no other construction would achieve the statutory aims.

325 U.S. at 733–34, 65 S.Ct. at 1295 (emphasis added).[16]

**16.** It should be noted that in reasoning thus, the Court stated that "[i]n this connection" it

*Burley* has been cited as "teach[ing] that individual rights of employees . . . cannot be nullified unless Congress clearly intended such consequences." *McElroy v. Terminal Railroad Ass'n.*, 392 F.2d 966, 969 (7th Cir.1968). We do not believe that Congress by the passage of the Act intended to take away existing rights of employees, e.g., the right not to be represented, but rather that it intended to grant additional rights. No intention to deprive employees of existing rights is contained in or can even be inferred from the Act. To the contrary, the obvious intent of the Act, as indicated by the language of the statute itself and the underlying legislative history, is that the goals of collective bargaining and employee freedom of choice are consonant and concurrent. The latter goal clearly is *not* subsumed by the former.[17]

### VIII.

Having determined that the plaintiffs and their fellow employees have the clear right under the Act to opt for nonrepresentation, we turn to the key question in this case of whether the Board violated a clear statutory duty in refusing to go forward with Russell's particular application. It is undisputed that once the Board had determined that Russell intended to terminate collective representation in favor of "exempt" status, the Board refused further to investigate his application and the subject representational dispute.

This court has the power to order the Board to investigate, to investigate fully and completely and properly, and to certify the representative chosen by the craft of employees. *Flight Engineers International*

*Ass'n. v. Eastern Airlines, Inc.*, 359 F.2d 303, 308 (2d Cir.1966). As noted earlier, the question of whether judicial review could be exercised to command the Board to "do what Congress commanded, namely, to investigate and certify," had been reserved in *General Comm. v. Missouri-K.T.R.R.*, 320 U.S. at 336 n. 12, 64 S.Ct. at 152.

■ Eliminating any reservation that existed, the Court in *BRAC v. Association for Benefit of Non-Contract Employees,* stated that in reviewing the Board's actions in a section 2, Ninth, representation dispute, a court's review extends only to determine whether the Board did in fact conduct the investigation. 380 U.S. at 661, 85 S.Ct. at 1198. The Act does not prescribe any set forms for such investigation and leaves that largely to the Board's discretion. *Id.* at 662, 85 S.Ct. at 1198. The Court did note, however, that despite that "broad and sweeping" command, "the Board's duty to investigate is a duty to make such investigation *as the nature of the case requires.*" *Id.* (Emphasis added.)

In *International In-Flight Catering Co. v. NMB,* 555 F.2d 712 (9th Cir.1977), the Board had determined in 1974 that, based on authorization cards indicating a desire that the Teamsters be certified as the bargaining representative, a representational dispute existed. An election was held. The Teamsters lost the election and the Board certified that there was no bargaining representative for IICC's employees. In 1975, after authorization cards *requesting an election* had again been signed, the Board determined that a representational dispute again existed. This time, however, the Board, without holding any election, certi-

---

was significant that the Act did not provide for closed shops and that, accordingly, workers in minority unions and unorganized workers were implicated in the issue. The Act was amended in 1951 (64 Stat. 1238) to allow such closed shops, under 45 U.S.C. § 152, Eleventh. So some question exists about whether the result, if reached by the Court today, would be the same. *See Burley,* 327 U.S. at 667, 66 S.Ct. at 724 (Frankfurter, J., dissenting from modified opinion). We do not think, however, that this in any way diminishes the applicability of the quoted language to the decision here.

17. The history of union security in the railway industry is marked *first,* by a strong and long-standing tradition of voluntary unionism on the part of the standard rail unions, *second,* by the declarations in 1934 of a congressional policy of complete freedom of choice of employers to join or not to join a union.
*International Association of Machinists v. Street,* 367 U.S. at 750, 81 S.Ct. at 1790.

fied the union as the collective bargaining representative.[18] IICC filed suit seeking a declaratory judgment, and the district court enjoined enforcement of the Board's certification.

On appeal, the Board contended that under the Act its actions regarding a representational dispute were not judicially reviewable, relying, as here, on *Switchmen's Union.* The Board stated that it had fulfilled its statutory duty to investigate in that it had compared the signatures on the authorization cards with those on IICC's payroll. The Board argued that the scope and form of its investigation, and its decision based thereon, were within its statutory discretion and as such were beyond the court's jurisdiction. The court disagreed.

This position advanced by the NMB disregards the import of § 2, Ninth, of the RLA, and *Railway Clerks v. Non-Contract employees.* Both state that the NMB has a duty to investigate *the dispute.* The dispute, in this case, advanced by the IICC was that the cards signed by the employees only called for an election and were not votes for representation without an election. The actual investigation undertaken by the NMB in merely comparing the signatures assumes the disputed point, that the cards represented votes . . . .

. . . .

It is a perversion of the search for truth and the policy of the RLA for the NMB to continue to insist, in these circumstances, that it conducted an investigation and discharged its duty under the RLA.

555 F.2d at 718–19.

Judge Friendly in *Ruby v. American Airlines,* 323 F.2d at 255, stated succinctly that "[t]he Board's duty to investigate is a duty to make such investigation as the nature of the case demands." As indicated previously, the nature of the instant case is that the plaintiffs and their fellow employees dis-pute the incumbent union's representative status and have an apparent desire not to bargain collectively. When the Board's investigation reached the point of determining the intent of the employees, the Board refused further "to progress" Russell's application, refused further to investigate the legitimate dispute among the employees as to whether the union was their representative, and thereby denied the employees their rights under the Act. When the Board balked, it crossed over from being a disinterested "referee" to being a participant. To repeat, "[u]nder this Act Congress did not give the Board discretion to take or withhold action, to grant or deny relief. It gave it no enforcement functions. It was to find the facts and then cease . . . ." *Switchmen's Union,* 320 U.S. at 305, 64 S.Ct. at 99. The Board failed here to find the fact in dispute: who is the true representative of the employees? It is, therefore, a "perversion of truth" for the Board to insist that it conducted the investigation and discharged its duty under the Act.

## IX.

This case is therefore reversed and remanded to the district court. The court shall remand this case to the Board and direct it to proceed with its investigation into the application filed by Russell as it would any other application for investigation of a representational dispute, and not inconsistent with this opinion.

REVERSED and REMANDED.

---

**18.** Upon IICC's ignoring the Board's certification, the Board authorized the union to commence unilateral action against IICC, including strikes and picketing, thereby running directly counter to what it so persistently espouses as its sole duty under the Act, the prevention of work stoppages.